**Emmanuel Senyo AGYEMAN,**
Petitioner,

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 99–70396.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 16, 2001.

Filed July 23, 2002.

---

872

Christopher B. Durbin (argued), Kristen Kay Mitchell (argued), Eric Schnapper, Amy Edwards, Seattle, Washington (University of Washington School of Law (Stu-

dents of Pro Bono Program)); Leonard J. Feldman, Heller, Ehrman, White & McAuliffe, Seattle, Washington; Daniel M. Kowalski, Ryan, Swanson & Cleveland, Seattle, WA, for the petitioner-appellant.

John S. Hogan (argued) and John M. McAdams, Jr., U.S. Department of Justice, Washington, DC, for the respondent-appellee.

Before FERGUSON, KLEINFELD, and GOULD, Circuit Judges.

Opinion by Judge FERGUSON; Dissent by Judge KLEINFELD.

## OPINION

FERGUSON, Circuit Judge.

Emmanuel Senyo Agyeman ("Agyeman"), a native and citizen of Ghana, petitions for review of the Board of Immigration Appeals' ("BIA") decision, affirming the Immigration Judge's ("IJ") denial of his request for suspension of deportation pursuant to Section 244(a)(1) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1254(a)(1) (repealed 1996) ("Section 244"), and adjustment of status pursuant to Section 245 of the INA, 8 U.S.C. § 1255 ("Section 245"). Agyeman claims that he was denied a full and fair hearing because he was not given adequate instructions as to how to proceed with his applications for relief. Specifically, he alleges, among other errors, that the denial of adjustment of status was predicated on his inability to procure his wife's attendance at the deportation hearing to testify on his behalf. Given that his wife suffers from bipolar disorder and resides thousands of miles from the site of the proceedings, we agree. Accordingly, we grant the petition and now remand for a new hearing. In addition, we hold that the filing fees provisions of the Prison Litiga-

tion Reform Act ("PLRA") do not apply to INS detainees.

## I. BACKGROUND

Agyeman entered the United States on a B-1 visitor visa in 1988. In 1991, he married a United States citizen, Barbara Levy ("Levy"), and the couple established a home together in Elizabeth, New Jersey. Levy subsequently filed an Form I-130 immediate relative visa petition, which was approved in 1992. However, Agyeman's application for adjustment of status was denied because the couple failed to attend the scheduled interview and submit Agyeman's medical examination. As reflected in the record, Levy was unable to attend the interview because she was hospitalized for bipolar disorder at the time.

In 1993, Agyeman relocated to Carson City, Nevada, for business purposes, and resided there until being detained by the INS for overstaying his visa in early 1997. INS officials transported Agyeman to a detention facility in Eloy, Arizona, where he remained during the course of the proceedings.

On July 28, 1997, the IJ found Agyeman deportable under Section 241(a)(1)(B) of the INA, 8 U.S.C. § 1231(a)(1)(B), and denied his request for suspension of deportation under Section 244. Reviewing Agyeman's application for adjustment of status based on his marriage to a United States citizen pursuant to Section 216 of the INA, 8 U.S.C. § 1186a ("Section 216"), the IJ instructed Agyeman that his wife's testimony was mandatory to determine the bona fides of their marriage. Upon questioning about his wife, Agyeman informed the IJ that Levy suffered from bipolar disorder and had been hospitalized for two or three months at a time. The IJ asked whether Levy was still hospitalized, to which Agyeman responded: "I don't know." At the close of the hearing, the

IJ stated that "you need to contact and have available at the next hearing, your spouse. *She must be physically present at that hearing,* otherwise, I can't grant your application for adjustment of status." (emphasis added). The IJ granted a continuance for Agyeman to procure her attendance. On November 5, the IJ denied Agyeman's application for adjustment of status because Levy did not appear and testify on his behalf and because his medical examination was not on file. The IJ granted his application for voluntary departure to Ghana pursuant to Section 244(e) of the INA, 8 U.S.C. § 1254(e).

On appeal, the BIA affirmed in all respects. It denied Agyeman's application for an adjustment of status pursuant to Section 245 on the basis that he had failed to establish the validity of his marriage to Levy, affirming the IJ's rationale that she failed to testify at the deportation hearing.[1] It also refused to grant the application on discretionary grounds. As to the denial of suspension for deportation, the BIA affirmed on the basis that Agyeman had failed to demonstrate an "extreme hardship" to himself or to his wife.

This timely petition for review followed. We granted Agyeman's request for leave to proceed *in forma pauperis* and instructed the parties to brief the issue whether the PLRA filing fee provisions apply to INS detainees.

## II. JURISDICTION

This petition is governed by the transitional rules of the Illegal Immigration Re-

form and Immigrant Responsibility Act of 1996 ("IIRIRA"). *Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997). We have jurisdiction to hear Agyeman's due process claims pursuant to 8 U.S.C. § 1105a(a), as amended by IIRIRA section 309(c)(4). *Antonio–Cruz v. INS,* 147 F.3d 1129, 1130 (9th Cir.1998).

## III. STANDARD OF REVIEW

■ We review claims of due process violations in deportation proceedings de novo. *Sanchez–Cruz v. INS,* 255 F.3d 775, 779 (9th Cir.2001). We also review de novo legal interpretations of the INA's requirements. *Andreiu v. Ashcroft,* 253 F.3d 477, 482 (9th Cir.2001) (en banc). Because our standard of review is de novo, we conduct an independent examination of the entire record. *Perez–Lastor v. INS,* 208 F.3d 773, 777 (9th Cir.2000). When the BIA reviews the IJ's decision de novo, our review is limited to the BIA's decision, except to the extent that the BIA adopted the IJ's opinion. *Cordon–Garcia v. INS,* 204 F.3d 985, 990 (9th Cir.2000) (citing *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995)).

## IV. DISCUSSION

### A. Due Process Rights in Deportation Proceedings

■ The Fifth Amendment guarantees individuals who are subject to deportation due process in INS proceedings. *Jacinto v. INS,* 208 F.3d 725, 727 (9th Cir.2000) (citing *Campos–Sanchez v. INS,*

---

1. In its opinion, the BIA stated that the IJ denied Agyeman's application for adjustment of status pursuant to Section 245. However, the IJ explicitly analyzed the application under Section 216, presumably because the petition upon which Agyeman's application relied was filed prior to the second anniversary of his marriage and, thus, subject to the additional requirements of the statute. As ex-

plained below, these statutes are not mutually exclusive; the applicable regulations provide that an application for adjustment of status filed in deportation proceedings under Section 245 and based on a marriage, which is less than two years old, results in conditional residency pursuant to Section 216. 8 C.F.R. § 240.11(a)(1) (2001).

164 F.3d 448, 450 (9th Cir.1999)). "An alien who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf." *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir.2000). In addition, aliens in deportation proceedings are entitled by statute and regulation to certain procedural protections. *Barraza Rivera v. INS*, 913 F.2d 1443, 1447 (9th Cir.1990); *Baires v. INS*, 856 F.2d 89, 91 (9th Cir.1988). For example, an alien must be afforded a reasonable opportunity to present evidence on his behalf. INA § 240(b)(4), 8 U.S.C. § 1229a(b)(4); 8 C.F.R. § 240.10(4) (2001); *see also* INA § 240(b)(1); 8 U.S.C. § 1229a(b)(1) (providing that the immigration judge must receive evidence); 8 C.F.R. § 240.1(c) (2001) (same). If an alien is prejudiced by a denial of any of the applicable procedural protections, he is denied his constitutional guarantee of due process. *Campos–Sanchez*, 164 F.3d at 450.

■ One of the components of a full and fair hearing is that the IJ must adequately explain the hearing procedures to the alien, including what he must prove to establish his basis for relief. *Jacinto*, 208 F.3d at 728. In addition, when the alien appears pro se, it is the IJ's duty to "fully develop the record." *Id.* at 733–34. Because aliens appearing pro se often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from this country, it is critical that the IJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Id.* at 733 (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985)).

**B. Full and Fair Hearing**

■ Agyeman claims that he was denied a full and fair hearing because, among other errors, the IJ failed to provide an adequate explanation of the procedures and thereby denied him a full and fair hearing. At his deportation hearing, the IJ ruled that Levy's testimony was the only means by which Agyeman could successfully prosecute his application for adjustment of status, despite the fact that she suffered from a bipolar disorder and lived thousands of miles away. On appeal, the BIA affirmed the IJ's denial of Agyeman's applications for relief on the basis that Agyeman had failed to establish his marriage to a United States citizen. Under the circumstances, we find that Agyeman did not receive an adequate explanation as to what he had to prove to support his application for adjustment of status and was thereby denied a full and fair hearing.

**1. Exhaustion of Administrative Remedies**

■ As a threshold matter, we find that Agyeman's due process claim was properly exhausted below. While we retain jurisdiction to review due process challenges to immigration decisions, *Antonio–Cruz*, 147 F.3d at 1130, we may not entertain due process claims based on correctable procedural errors unless the alien raised them below. *Sanchez–Cruz*, 255 F.3d at 780; *Cortez–Acosta v. INS*, 234 F.3d 476, 480 (9th Cir.2000). The exhaustion requirement applies to claims that an alien was denied a "full and fair hearing." *Sanchez–Cruz*, 255 F.3d at 780.

■ Albeit inartfully, Agyeman raised pro se his due process claims in his notice of appeal to the BIA. Although he did not use the specific phrase 'due process violation,' he did protest the requirement that his wife testify at the hearing, explaining that she was in poor health and advised by her doctor not to make the trip. He also

requested that she be permitted to appear "at a convenient location for the required interview."

Because Agyeman raised his claims pro se, we construe them liberally. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Under this scrutiny, Agyeman satisfies the exhaustion requirement for his due process claim that he was denied a full and fair hearing, due to the IJ's insistence that his wife appear and testify at the hearing. Further, because the BIA conducted a de novo review of the IJ's decision, "it had a full opportunity to resolve [the] controversy or correct its own errors before judicial intervention." *Ladha v. INS*, 215 F.3d 889, 903 (9th Cir.2000). Thus, even to the extent that Agyeman's pro se appeal did not contain the exact legalese, the BIA had adequate opportunity to correct any errors occurring in the proceedings below. Accordingly, we hold that Agyeman's due process claim was properly exhausted before the BIA.

### 2. Requirement of Spouse's Testimony

At the deportation hearing, the IJ instructed Agyeman that his wife must appear and testify on his behalf, granting a continuance for him to produce her as a witness. When she did not appear, the IJ denied the application for adjustment of status, reasoning that his spouse was "unable or unwilling to appear and testify in his behalf." *Matter of Agyeman*, No. A–29–765–590, slip op. at 3 (IJ Nov. 5, 1997). The BIA affirmed the IJ's denial of Agyeman's application, observing that Agyeman "was on notice of the need for his wife to testify," but failed to produce her or any other witnesses at the deportation hearing. *Matter of Agyeman*, No. A29–765–590–Eloy, slip op. at 2 (BIA Mar. 16, 1999). Therefore, the BIA ruled, Agyeman "failed to establish his marriage to a United States citizen for purposes of adjustment of status." *Id.*

At the outset, we note that Levy's attendance and testimony at the deportation hearing was not a statutory prerequisite for adjustment of status. On the face of the statute and accompanying regulations, Agyeman was only required to provide sufficient evidence of his bona fide marriage to a United States citizen. Yet, this was never explained to him. He was simply told that she must be there or his application would be denied. For a full understanding of what was legally required, we turn to a discussion of the statutory and regulatory framework governing the adjudication of adjustment of status applications based on marriage to a United States citizen.

### a. Statutory and Regulatory Framework

Section 245 is the proper statutory framework for adjudicating an application for adjustment of status filed by an alien in deportation proceedings. 8 C.F.R. §§ 240.1(a)(1)(ii), 240.11(a)(1) (2001). The IJ has exclusive jurisdiction to decide the adjustment of status application. 8 C.F.R. § 245.2(a)(1) (2001). However, only the INS may adjudicate the underlying I 130 visa petition. 8 C.F.R. § 204.1(e) (2001); *Dielmann v. INS*, 34 F.3d 851, 854 (9th Cir.1994).

Under Section 245, an alien may be eligible for adjustment of status if, among other prerequisites, an immigrant visa is immediately available. INA § 245(a); 8 U.S.C. § 1255(a). One of the ways by which an alien may become eligible to receive an immigrant visa is through marriage to a United States citizen. INA § 201(b), 8 U.S.C. § 1151(b). An approved I 130 filed by the spouse satisfies the requirement that a visa is immediately available. *INS v. Miranda*, 459 U.S. 14,

15, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982). Once approved, the I 130 remains valid for the legal duration of the marriage. 8 C.F.R. § 204.2(h)(1) (2001).

However, approval of the I 130 petition does not automatically entitle the alien to adjustment of status as an immediate relative of a United States citizen. *INS v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (citing *Menezes v. INS,* 601 F.2d 1028 (9th Cir.1979)). While an I 130 establishes eligibility for status, the Attorney General—or in the context of deportation proceedings, the IJ—must still decide to accord the status.[2] *Amarante v. Rosenberg,* 326 F.2d 58, 62 (9th Cir.1964).

As part of the investigative process for adjustment of status, the alien must attend an interview with an immigration officer. 8 C.F.R. § 245.6 (2001). While the regulations do not explicitly require the spouse to appear or testify on the alien's behalf, as a practical matter, the INS often requests the attendance of both the alien and the spouse at the initial adjustment interview. *See* SARAH IGNATIUS, IMMIGRATION LAW AND THE FAMILY § 8.04[5] at 8–60 (2001). Its authority to do so is found in its general regulatory power to request the appearance of an applicant, petitioner, sponsor, or beneficiary. 8 C.F.R. § 103.2(b)(9) (2001). This authority to request an appearance does not generally extend to the IJ in deportation proceedings; however, he may "issue subpoenas for the attendance of witnesses and presentation of evidence." INA § 240(b)(1), 8 U.S.C. § 1229a(b)(1).

If the alien's marriage is less than two years old, adjustment of status is granted on a conditional basis pursuant to Section 216.[3] INA § 216(g)(1), 8 U.S.C.

**2.** Agyeman argues that, because he had an approved I 130 on file and his marriage was consummated prior to being placed in deportation proceedings, he was not required to prove his bona fide marriage to a United States citizen. For a marriage to confer immigration benefits, it must satisfy three criteria. First, it must be legally valid. *Adams v. Howerton,* 673 F.2d 1036, 1038–39 (9th Cir. 1982). Second, the couple must have married out of a bona fide desire to establish a life together, not to evade immigration laws. *Lutwak v. United States,* 344 U.S. 604, 611, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Bark v. INS,* 511 F.2d 1200, 1202 (9th Cir.1975). Third, the marriage must not be against public policy. *Matter of H,* 9 I & N Dec. 640, 641 (BIA 1962).

The approved I–130 provides prima facie evidence that the alien is eligible for adjustment as an immediate relative of a United States citizen. *Amarante v. Rosenberg,* 326 F.2d 58, 62 (9th Cir.1964). However, we reject Agyeman's argument that no other evidence of the marriage is ever necessary. His reliance on *Varela v. INS,* 204 F.3d 1237 (9th Cir.2000), is misplaced. In *Varela,* we remanded to the BIA to review the merits of a motion to reopen, noting that the alien had made a prima facie showing of eligibility for adjustment of status because he had submitted the application and all necessary supporting documentation. 204 F.3d at 1240 n. 6. We noted further that he was not required to demonstrate the bona fides of his marriage by clear and convincing evidence because his marriage preceded the deportation hearings. *Id.*

*Varela* concerned whether the alien had made a prima facie showing to warrant the BIA's granting of a motion to reopen when deportation had proceeded *in absentia. Id.* at 1239–40. Here, Agyeman had the responsibility to prove his eligibility for adjustment of status by the preponderance of the evidence. While the I–130 may suffice in many cases, in cases such as this when the spouse has never testified as to the bona fides of the marriage, the approved petition might not *standing alone* prove by a preponderance of the evidence that the marriage was bona fide and not entered into to evade immigration laws.

**3.** In 1986, Congress enacted the Immigration Marriage Fraud Amendments ("IMFA") to deter marriage fraud in immigration petitions. Pub.L. No. 99–639, 100 Stat. 3537 (1986) (codified in scattered sections of Title 8 of the U.S.Code). Under the IMFA, an alien whose status is adjusted to legal permanent resident

§ 1186a(g)(1). The conditional status remains in effect for a two-year period, after which the alien must satisfy additional requirements under Section 216 to remove the conditionality of his legal residency. 8 C.F.R. § 240.11(a)(1) (2001). These requirements include a joint petition and interview with his spouse. INA § 216, 8 U.S.C. § 1186a. However, if the spouse refuses to participate in this process, the alien may file the petition alone and request a hardship waiver of the joint filing requirement. 8 C.F.R. §§ 216.4(a)(1), 216.5 (2001). In addition, while both the alien and the spouse must ordinarily appear for an interview at a local INS office, this requirement may be waived for good cause. INA §§ 216(c)(1)(B), (c)(2)(A)(ii), (d)(3), 8 U.S.C. §§ 1186a(c)(1)(B), (c)(2)(A)(ii), (d)(3); 8 C.F.R. § 216.4(b)(3) (2001). Whether or not the alien fulfills these additional requirements is left to the exclusive jurisdiction of the INS District Director. *Id.*

In this case, Levy filed an I–130 visa petition on Agyeman's behalf, and the INS approved it in 1992. Agyeman filed an application for adjustment of status, and the INS requested an interview with both spouses. However, Levy could not attend the interview because she was hospitalized for bipolar disorder at the time. Consequently, the INS denied Agyeman's application for adjustment of status for lack of prosecution.

In the deportation proceedings, the IJ analyzed Agyeman's application for adjustment of status under Section 216, even though his marriage was more than two years old, presumably because the petition upon which he relied was filed within two years of his marriage to Levy. One of the requirements that the IJ specified for the application was that Agyeman's wife must appear and testify at the hearing. It is unclear under what authority the IJ undertook this request. We decline to interpret the IJ's request as an attempt to enact a statutory requirement that the spouse must attend and testify at the deportation hearing in every case in which an application for adjustment relies on a marriage to a United States citizen. We also decline to interpret this as an improper attempt to either readjudicate Levy's original petition or to enforce Section 216's joint interview requirement.[4] Nevertheless, the IJ's demand was fundamentally unfair under the circumstances. The IJ and the BIA, on appeal, should have acknowledged the role that Levy's illness played in her inability to attend the original interview, and this hearing as well.

### b. Good Cause Waiver

Under the statutory and regulatory scheme governing INS interviews, a good cause waiver may apply. For example, if the INS requests an appearance by an applicant or petitioner, the interview may

---

on the basis of a marriage that is less than two years old must serve a two-year "conditional" residency period to ensure that the marriage is bona fide and not entered into to evade immigration laws. INA § 216(g)(1), 8 U.S.C. § 1186a(g)(1).

4. However, there is some evidence in the record that suggests the IJ did intend to adjudicate the relative petition. For example, he stated that:

Q: [W]hen we conduct this adjustment of status application ... I will set it up for

a hearing date on which I want your, your wife must appear and testify and indicate that she still wants to support you or to petition for you as a relative of hers. Okay. It is her petition, not really yours, okay. So, she ... must be present for me to ask questions of and the Government can cross examine, too, as the validity of the marriage and her willingness to basically support your application for residency here.

be rescheduled upon a showing of good cause.[5] 8 C.F.R. § 103.2(b)(9) (2001). In addition, the regulations pertaining to Section 216's joint interview requirement provide for good cause waivers in cases in which the alien and/or the spouse cannot attend the INS interview preceding the removal of the conditional status of their legal residency based on the marriage. INA § 216(c)(2)(ii), 8 U.S.C. § 1186a(c)(2)(ii); 8 C.F.R. § 216.4(b)(3) (2001). A documented serious illness may constitute good cause for a spouse's absence at the interview. *See generally* IGNATIUS, *supra*, at § 5.08[3][c] (advising that "good cause" to waive the spouse's attendance at an INS interview prior to removal of the conditional basis of residency must be "legitimate and well documented, such as extreme illness . . . .").

In this case, the IJ or the BIA, on appeal, should have recognized that good cause excused Levy's absence at the original INS interview, and at the deportation hearing, as well. Levy suffers from bipolar disorder, which is a "chronic condition that has potentially devastating effects on many aspects of the patient's life and that carries with it a high risk of suicide." AM. PSYCHIATRIC ASS'N, PRACTICE GUIDELINES FOR THE TREATMENT OF PSYCHIATRIC DISORDERS 531 (2000); William Coryell, M.D., et al., *The Enduring Psychosocial Consequences of Mania and Depression*, 150 AM. J. PSYCHIATRY 720–27 (1993) (explaining that bipolar disorder diminishes one's ability to function on nearly all levels and persists despite medication and treatment). Bipolar disorder is a severe psychiatric illness marked by episodes of mania and depression, impairment of functioning—both cognitive and behavioral, and is frequently complicated by psychotic symptoms (e.g., delusions, hallucinations, and disorganized thinking). Paul E. Keck, Jr., et al., *Bipolar Disorder*, 85 THE MEDICAL CLINICS OF NORTH AMERICA 645 (2001). Persons suffering from bipolar disorder "are prone to rapid mood fluctuations" and thus pose a particular risk of suicide or other harmful behavior. AM. PSYCHIATRIC ASS'N, *supra*, at 530.

As explained to the IJ at the July 28th hearing, Levy had been hospitalized for periods of two to three months at a time, due to her mental illness. Upon the IJ's questioning, Agyeman did not know whether she was hospitalized at the time.[6] However, given Levy's history of serious mental illness, it would be understandable if she was unable to travel to Arizona to testify at the deportation hearing. Indeed, one of the most critical aspects of treating bipolar disorder is establishing and maintaining a stable routine to avoid recurrence of manic and depressive episodes. CLINICIAN'S GUIDE TO MENTAL ILLNESS 111 (Dennis C. Daley, ed., 2001). Agyeman attempted to explain the difficulty of having Levy attend, specifically mentioning concerns about placing undue pres-

---

5. We observe that 8 C.F.R. § 103.2(b)(9) only provides that good cause will permit the requested individual to reschedule the interview. It does not specifically address a circumstance in which the person is simply unable to attend the interview due to serious illness or otherwise. However, we do not interpret the provision to exclude such a possibility because to do so would raise serious due process concerns.

6. Contrary to the dissent's assertion, we do not imply that Levy was, in fact, in the hospital at that time. Rather, we observe that it is unclear from the record whether she was hospitalized at any relevant point during the proceedings. The seriousness of her illness, as well as her prior history of hospitalization, raises due process concerns because the success of Agyeman's applications for relief hinged on the presence of a person whose attendance may have been physically impossible or medically inadvisable.

sure on her and the fact that his detention prevented him from traveling to New Jersey to accompany her on her trip.[7]

Notwithstanding these indicators, the IJ instructed Agyeman to arrange for Levy's appearance. Agyeman complied and asked Levy to travel to Eloy, Arizona, in order to testify at the November 5th hearing. However, she did not appear, and Agyeman was unable to confirm that she had arrived in Phoenix, where she was to stay with his friend. Thus, contrary to the dissent's assertion, it is unclear from the record whether Levy did, in fact, travel from her home in New Jersey to appear at the deportation hearing.[8] The lack of clarity in the record regarding whether Levy actually attempted to attend the hearing is further demonstrated by Agyeman's explanation of her absence in his notice of appeal to the BIA, wherein he stated that she was unable to be there because of her "poor health and [because] her doctor has recommended against making the trip." Thus, the record is not established as to whether Levy was in Arizona at the time of the hearing.

For our purposes, it is sufficient that, despite the IJ's awareness of Levy's serious illness and possible hospitalization, he still required Agyeman to procure her attendance and interpreted her subsequent absence as dispositive in his determination that Agyeman's marriage to Levy was not bona fide. Moreover, although Agyeman argued on appeal to the BIA that his wife was ill and had been unable to make the trip across country to testify, the BIA simply acknowledged that the situation was "regrettable" and affirmed the IJ's denial. *Matter of Agyeman*, slip op. at 2.

### 3. Inadequate Explanation of Procedures

As the bona fides of Agyeman's marriage were in question, the IJ had a duty to apprise Agyeman of reasonable means of proving them. *Jacinto*, 208 F.3d at 728. Although Levy's testimony would clearly be the most persuasive form of evidence, other types of evidence could very well have demonstrated the validity of Agyeman's marriage. Evidence of the marriage's bona fides may include: jointly-filed tax returns; shared bank accounts or credit cards; insurance policies covering both spouses; property leases or mortgages in both names; documents reflecting joint ownership of a car or other property; medical records showing the other spouse as the person to contact; telephone bills

---

7. This reaction is entirely consistent with how a family member of a person suffering from bipolar disorder might respond when faced with the decision whether to place that person in a stressful situation. Family members, who are experienced with the illness and its effects, likely understand that placing stress on a loved one suffering from bipolar disorder is likely to cause the onset of manic symptoms. *See* AM. PSYCHIATRIC ASS'N, *supra* at 543 (explaining that psychosocial stressors precipitates mania in persons suffering from bipolar disorder).

8. Indeed, the dissent picks and chooses from the record to support its statement that "Agyeman's wife was in fact in Arizona, not New Jersey, at the time of the hearing," Dis. Op. at 887. In so doing, it cites certain statements by Agyeman out of the context from other statements demonstrating his lack of knowledge as to her whereabouts at the time of the hearing. In fact, in response to the IJ's questioning, Agyeman stated:

A: She *should have arrived* here last week. She would (indiscernible) staying with my friend. I've given a—
. . .
She *must be* in Phoenix since last week. That's why—
Q: So, why isn't she in my Courtroom today to help you in your case?
A: The past seven days I've been in special housing. I've not been allowed telephone, visiting hours. I tried to—
(emphasis added).

showing frequent communication between the spouses; and testimony or other evidence regarding the couple's courtship, wedding ceremony, honeymoon, correspondences, and shared experiences. *Matter of Soriano*, 19 I & N. Dec. 764, 766 (BIA 1988); *see also* 8 C.F.R. § 216.4(a)(5) (2001) (listing similar types of evidence as proof that marriage was not entered into to evade immigration laws of the United States). Yet, the IJ failed to suggest these sources of evidence, which would have supported his application for adjustment of status.

 To the extent that Levy's testimony was essential to Agyeman's adjustment application, the IJ should have explained to Agyeman that she could participate telephonically. *Beltran–Tirado v. INS*, 213 F.3d 1179, 1185–86 (9th Cir.2000). Otherwise, because Levy resided in New Jersey—thousands of miles from the deportation proceedings—she could have appeared at the INS office nearest to her residence and submitted to a deposition. 8 C.F.R. § 3.35(a) (2001); *see also* 8 C.F.R. § 287.4(a)(2)(ii)(D) (2001) (providing that witness who is more than 100 miles from place of proceeding may be subpoenaed to appear at the nearest INS office and respond to oral or written interrogatories). However, the IJ did not explore these options, and the BIA similarly failed to suggest these alternatives on appeal.[9]

 Moreover, the IJ represented to Agyeman that he was ineligible for adjustment of status if his wife was no longer in love with him.[10] However, our case law has long held to the contrary. Thus, the IJ failed to explain that Agyeman could submit evidence showing that he entered into the marriage in good faith, even if it was the case that they were no longer in love. On remand, Agyeman's marriage to Levy must be found bone fide for purposes of adjustment of status if it was "not sham or fraudulent from its inception." *Dabaghian v. Civiletti*, 607 F.2d 868, 869 (9th Cir.1979). The key issue is: "Did the petitioner and his wife intend to establish a life together at the time of their marriage?" *Bark*, 511 F.2d at 1202. As we held in *Bark*, "[e]vidence that the parties separated after their wedding is relevant to ascertaining whether they intended to establish a life together when they exchanged marriage vows. But evidence of separation, standing alone, cannot support a finding that a marriage was not bona fide when it was entered." *Id.; see also Matter of McKee*, 17 I & N Dec. 332, 333 (BIA 1980) (distinguishing between nonviable and sham marriages).

 We have previously emphasized the importance of explaining to an alien what evidence will demonstrate their eligibility for relief from deportation. *Jacinto*, 208 F.3d at 728. Moreover, it is critical

---

9. The dissent would place the burden on Agyeman to request these alternatives. However, it is the IJ's duty to outline Agyeman's procedural rights for him, as a pro se alien in deportation proceedings. *Jacinto*, 208 F.3d at 734. Moreover, Agyeman might have perceived that such a request would be futile, due to the IJ's repeated insistence that his wife appear in person. Indeed, the administrative record is replete with examples of the IJ's unequivocal statements that Levy was required to attend the hearing in Eloy, Arizona. For example, the IJ stated: "[Y]ou need to contact and have available at the next hear-

ing, your spouse. She *must be physically present at that hearing*, otherwise, I can't grant your application for adjustment of status." (emphasis added).

10. For example, the IJ stated: "Well, I know this, if I was in jail and I got a hold of my wife and I said, honey, I'm in jail, I need you to show up in Timbuktu, Arizona, to let me stay here, if she loved me, she would come for me. If she didn't like me anymore, then your adjustment of status is gone anyway, Mr. Agyeman. That's all I'm telling you . . . ."

884

when the alien appears pro se that the IJ develop the record by eliciting all relevant facts. *Id.* at 734. The IJ must be responsive to the particular circumstances of the case, including what types of evidence the alien can and cannot reasonably be expected to produce in support of his applications for relief from deportation. *Cf. Gomez–Saballos v. INS,* 79 F.3d 912, 916 (9th Cir.1996) (rejecting BIA's requirement that asylum applicant must produce independent evidence of threat on his life or others because "evidentiary burden would be too great" for an alien who has fled his home country). Sensitivity to what evidence the alien can reasonably be expected to produce is especially critical when the alien is in the INS's custody. In such cases, the alien may have limited access to relevant documents and will, therefore, depend even more heavily on the IJ for assistance in identifying appropriate sources of evidence to support his claim.

Here, the IJ focused solely on the testimony of Agyeman's wife, despite her illness, and neglected to explain how Agyeman could otherwise establish eligibility for adjustment of status. Further, the IJ failed to adequately explore with Agyeman what evidence he could produce, given his limited access to documents and restricted ability to place telephone calls in detention. Although the BIA was correct in noting that Agyeman bore the "responsibility to provide evidence supporting his applications," *Matter of Agyeman,* slip op. at 2, the IJ also had an obligation to assist him, as a pro se applicant, in determining what evidence was relevant and by what means he could prove his claims. *See Jacinto,* 208 F.3d at 733–34. As in *Jacinto,* we are concerned here that Agyeman lacked the legal knowledge to discern what evidence was relevant and in what form that evidence could be presented. *Id.* Accordingly, it was critical that the IJ probed into all

the relevant facts regarding Agyeman's marriage and provided sufficient guidance as to how Agyeman could prove the bona fides of the marriage. Because he failed to do so, instead representing that Levy's attendance was the only possible means of demonstrating Agyeman's bona fide marriage, and because the BIA affirmed rather than corrected this error, Agyeman was deprived of a full and fair hearing.

We emphasize that our holding today will not transform IJs into attorneys for aliens appearing pro se in deportation proceedings, as the dissent attempts to argue. However, consistent with our holding in *Jacinto,* the IJ has a duty to fully develop the record when an alien proceeds pro se by probing into relevant facts and by providing appropriate guidance as to how the alien may prove his application for relief. A pro se alien is deprived of a full and fair hearing when the IJ mis-informs him about the forms of evidence that are permissible to prove his eligibility for relief. Here, the IJ led Agyeman to believe that he could not prove the bona fides of his marriage, short of producing a wife who testified that she was still in love with him. Thus, Agyeman was not only uninformed, but he was also misinformed about how to prosecute his application for adjustment of status. Therefore, Agyeman was deprived of a full and fair hearing.

### C. Prejudice

To merit relief, Agyeman must also show prejudice. Prejudice is shown if the violation "*potentially* ... affects the outcome of the proceedings." *Perez–Lastor,* 208 F.3d at 780 (quoting *Hartooni v. INS,* 21 F.3d 336, 340 (9th Cir.1994)) (emphasis in original); *accord Colmenar,* 210 F.3d at 972. We have held that prejudice may be shown where the IJ's inadequate explanation of the hearing procedures and

failure to elicit pertinent facts prevented the alien from presenting evidence relevant to their claim. *Jacinto*, 208 F.3d at 734–35.

Here, the IJ represented that the testimony of Agyeman's wife was the sole means of proving that his marriage was bona fide and cited her absence as one of the primary reasons for denying the application for adjustment of status. On appeal, the BIA expressly adopted the IJ's reasoning and affirmed. Had the IJ suggested other ways for Agyeman to prove the bona fides of his marriage, Agyeman might have proffered such evidence. *Singh v. INS*, 213 F.3d 1050, 1054 (9th Cir.2000) (finding prejudice when BIA applied new evidentiary requirements to alien's appeal because, if petitioner had been given notice, he might have secured the necessary documents). Moreover, the IJ's statements that adjustment depended on Levy's testimony that she still "wanted" and loved Agyeman deprived him of the notice and opportunity to pursue other forms of evidence demonstrating the couple's bona fide intent to establish a life together, even if they were no longer in love. *Id.*

Further, the IJ denied Agyeman's application out of hand at the November 5th hearing upon being informed that Levy was not present to testify. Thus, while the absence of a medical examination would also prevent adjustment of status, it was rendered moot by the IJ's ruling that Agyeman had withdrawn his application, due to his failure to produce his wife for testimony at the deportation hearing.[11]

 The INS argues that no prejudice may be found because Agyeman fails to cite record evidence establishing that the outcome of the proceedings would have been different. However, contrary to the INS' contention, Agyeman need not "explain exactly what evidence he would have presented" in support of his applications for relief. *Colmenar*, 210 F.3d at 972. Rather, we may infer prejudice in the absence of any specific allegation as to what evidence Agyeman would have presented had the IJ adequately explained what he needed to prove to demonstrate his eligibility for relief and had he been provided the opportunity to present that evidence. *Perez–Lastor*, 208 F.3d at 782.

We do not require Agyeman to "produce a record that does not exist." *Perez–Lastor*, 208 F.3d at 782. It is sufficient that the record reflects Agyeman was not provided an adequate explanation of how to prove the existence of his marriage to a United States citizen, short of producing her in front of the IJ, and that his failure to produce her resulted in the denial of his application for relief. Had the IJ provided an adequate explanation or sufficiently developed the record, Agyeman may have provided sufficient evidence to support his application for adjustment of status. Fundamental fairness requires that he have the opportunity to do so. Because the error potentially affected the outcome of the proceedings, we hold that Agyeman was prejudiced by the lack of a full and fair hearing.

## V. PRISON LITIGATION REFORM ACT

 We also hold that the filing fee provisions of the PLRA, Pub.L. No. 104–134, 110 Stat. 1321 (1996), do not apply to

---

11. In fact, the IJ did not even inquire as to whether Agyeman had documentation of his medical examination at the November 5th hearing. Thus, because the IJ summarily ruled that Agyeman's application was withdrawn due to his wife's failure to appear, we do not know whether the absence of an examination would have prevented Agyeman from obtaining relief.

an alien detainee who proceeds *in forma pauperis* to petition for review from a BIA decision, so long as he does not also face criminal charges.

Unlike other indigent litigants, prisoners proceeding *in forma pauperis* must pay the full amount of the filing fees in civil actions and appeals pursuant to the PLRA. 28 U.S.C. § 1915(b)(1); *Taylor v. Delatoore*, 281 F.3d 844, 847 (9th Cir.2002). If the prisoner lacks the means to pay the fee at the time of filing, the PLRA provides for assessment and subsequent collection of the fees as funds become available to him. 28 U.S.C. § 1915(b); *Taylor*, 281 F.3d at 847.

■ As defined in the PLRA, a "prisoner" is "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal·law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 28 U.S.C. § 1915(h). We have held that the statutory term "prisoner" is limited to an individual who is "currently detained as a result of accusation, conviction, or sentence for a *criminal* offense." *Page v. Torrey*, 201 F.3d 1136, 1139–40 (9th Cir.2000) (emphasis added). Thus, the term "prisoner" does not encompass a civil detainee for purposes of the PLRA. *Id.* We must now determine whether an alien detained by the INS pending deportation falls within the term "prisoner," or is a civil detainee falling outside the ambit of the PLRA.

■ It is well established that deportation proceedings are civil, rather than criminal, in nature. *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778, (1984); *Kim v. Ziglar*, 276 F.3d 523, 530 (9th Cir.2002). As early as 1893, the Supreme Court held: "The order of deportation is not a punishment for crime." *Ting v. United States*, 149 U.S.

698, 730, 13 S.Ct. 1016, 37 L.Ed. 905 (1893). By means of explanation, Justice Holmes later stated: "Congress has power to order the deportation of aliens whose presence in the country it deems hurtful. The determination by facts that might constitute a crime under local law is not a conviction of crime, nor is the deportation a punishment; it is simply a refusal by the Government.to harbor persons whom it does not want." *Bugajewitz v. Adams*, 228 U.S. 585, 591, 33 S.Ct. 607, 57 L.Ed. 978 (1913). In accordance with these earlier pronouncements, "[d]eportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure." *Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 96 L.Ed. 586 (1952); *see also United States v. Yacoubian*, 24 F.3d 1, 10 (9th Cir.1994) (dismissing an ex post facto challenge to deportation because the ex post facto clause is only applicable to "criminal laws").

Consistent with the principle that deportation is a civil rather than a criminal procedure, we hold that an alien detained by the INS pending deportation is not a "prisoner" within the meaning of the PLRA. Thus, we join two of our sister circuits in holding that the filing fee requirements of the PLRA do not apply to an alien detainee proceeding *in forma pauperis* to petition for review of a BIA decision. *See LaFontant v. INS*, 135 F.3d 158, 165 (D.C.Cir.1998); *Ojo v. INS*, 106 F.3d 680, 682–83 (5th Cir.1997).

In the case at bar, Agyeman was detained by the INS as deportable under INA § 241(a)(1)(B) for overstaying his visa. He was not accused or convicted of, sentenced or adjudicated delinquent for, a violation of criminal law. Thus, Agyeman is not a "prisoner" within the meaning of the statute, and the PLRA's filing fee provisions do not, therefore, apply.

## VI. CONCLUSION

We do not decide the merits of Agyeman's applications for relief from deportation. We hold only that he did not receive a full and fair hearing, that he suffered prejudice, and thus was denied his constitutional right to due process. Accordingly, we **VACATE** the Board's decision, and we **REMAND** the case to the Board with instructions to remand to the Immigration Judge for a new hearing to determine whether Agyeman is eligible for an adjustment of status in accordance with this opinion.

**Petition GRANTED.**

KLEINFELD, Circuit Judge, dissenting:

I dissent.

The majority opinion provides a misleading description of the facts and creates bizarre new constitutional law. We had previously held, in a split decision, that an immigration judge must, as a matter of due process, diligently elicit relevant facts from a pro se asylum seeker facing deportation, such as asking the alien to provide narrative testimony that might explain away apparent credibility problems.[1] Yet today, we hold that when the immigration judge did just that, by telling the prospective deportee that to win his case he was going to need his wife's testimony, the judge *denied* the applicant due process. The majority opinion reaches that conclusion by offering a psychiatric diagnosis and prognosis of the wife that no physician has ever given, so far as the record shows. The wife never appeared, and her medical records have never been provided. Under today's decision, not only does an immigra-

tion judge have to act as a lawyer and psychiatrist, but if he tells the petitioner that he must present more than the minimum required by law to prevail, even if it's true, it's a denial of due process. There just isn't any point to an administrative law system that delegates decision-making to specialized administrative judges, if this is how we perform our review function.

The majority's theory appears to be that the INS denied Agyeman due process of law because it imposed an impossible and unjustified requirement on him, that his wife appear in person in Arizona at the hearing when she was perhaps hospitalized in New Jersey or unable to travel to Arizona. This is wrong for several reasons:

(1) the testimony before the IJ established that Agyeman's wife was in fact in Arizona, not New Jersey, at the time of the hearing;

(2) the record does not establish that the wife was hospitalized in New Jersey at the time of the hearing;

(3) the hearing was for two purposes, to give Agyeman a second chance to have his petition for adjustment of his status granted, and also to give him a chance to avoid deportation by showing that it would work a hardship on his wife, and it was entirely fair for the IJ to tell him he wasn't going to grant relief unless he heard from Agyeman's wife;

(4) the IJ gave Agyeman multiple continuances for several months to produce his wife, and Agyeman never advised the IJ of any difficulty in doing so arising from her mental condition or his finances, just from his being in jail; and

(5) even if his wife had come to court and testified, he couldn't have gotten his adjustment of status, because he

1. *Jacinto v. INS*, 208 F.3d 725, 734 (9th Cir. 2000).

hadn't produced the necessary medical certificate.

## Facts

I lay out the hearings in considerable detail to show the very great extent to which the IJ went to try to help Agyeman avoid deportation. Agyeman was born in Ghana and grew up in England. Before coming to the United States he had been living in Brussels. He has a Master's Degree from the London School of Economics. He testified that he had an importing business from which over the past four years he had made about $50,000 per year in profits on average. He had married an American citizen, Barbara Barrett Levy, who also had a post-graduate degree. Ms. Levy apparently developed a mental illness, bipolar disorder, which occasionally put her in the hospital for two or three months, but which was controlled by medication the rest of the time. No medical records or physicians' reports have ever been provided to establish the exact nature or intensity of her disorder. Everything about bipolar disorder in the majority opinion is generic research done in an appellate judge's chambers, totally without foundation in the record. All we have in the record is Agyeman's lay testimony, and his contact with his wife seems to have been tenuous at best.

In 1991, after her marriage to Agyeman, Ms. Levy applied for an adjustment of her husband's status to permanent resident, based on his being her spouse. His visa was approved on the basis of her application, and the couple was given a time for an interview for the adjustment of status, with a form notice saying, "IF YOUR APPLICATION IS BASED ON A MARRIAGE TO A U.S. CITIZEN OR LAWFUL PERMANENT RESIDENT *BOTH SPOUSES MUST APPEAR.*" However, in 1992, Agyeman and his wife failed to

appear at an adjustment of status interview. The INS denied his application without prejudice to renewal, and Agyeman was ordered to depart from the United States. The decision wasn't only based on failure to appear. It also referred to "a required medical examination report from an authorized physician" and said: "Having failed to present the required documentation at interview, your application is denied for lack of prosecution." The notice ordered Agyeman to depart from the United States the following month. But he didn't.

Agyeman next turned up before the INS in 1997. He had been arrested in February of that year on unrelated criminal charges in Nevada (passing a bad check, which Agyeman said was a contract dispute relating to his business), and the INS was notified and commenced deportation proceedings. On May 13, 1997, he appeared for a hearing. It was the third time Agyeman had appeared, having already obtained two continuances. At the May hearing, the IJ gave Agyeman additional time so that he could ask his wife to mail his passport from New Jersey, where she lived and where Agyeman said his passport was, and so that the INS could obtain additional documentation regarding Agyeman's status, since he said he had had an approved visa.

At the next hearing, two weeks later, Agyeman said he'd written to his wife but had neither heard from her nor received the passport. The IJ gave Agyeman another continuance so that his wife could send the documents. The INS lawyer noted that the file showed that the 1992 adjustment of status was denied both because Agyeman's medical report was not filed and also because "his spouse failed to attend the interview and she apparently is, there's a letter in here from her mother saying that she's mentally ill and was hos-

pitalized and there is some allegation of marriage fraud." This is evidently why the majority opinion hypothesizes that she might have been hospitalized in New Jersey at the time of the hearing. That overlooks the five year gap between the initial hearing where Levy didn't show up because she was hospitalized, and the hearing at issue, where Agyeman testified that ordinarily his wife's disease was controlled by medication and did not require hospitalization.

The IJ sustained the charge of deportability, but told Agyeman (who was pro se) that he could avoid actually getting deported in either of two ways: he could pursue the same adjustment of status that he had failed to prosecute five years before, when his wife didn't appear, and he didn't file the medical report; or, alternatively, if he could show that his deportation would cause extreme hardship to himself or his wife, or any children or parents legally present in the U.S. and had seven years of residence with no crimes of moral turpitude, he could apply for suspension of deportation. The IJ suggested that Agyeman fill out an adjustment of status application for his wife to get him in as her spouse and that he get the medical report. He said that at the next hearing, he would give Agyeman both an adjustment of status hearing and a hardship suspension hearing. But, the IJ told him, because Agyeman needed to show that she still wanted him in the country, "the petitioning relative must be present for me to ask questions of and the government can cross-examine too, as to the validity of the marriage and her willingness to basically support your application for residency here."

Told that his wife should be present, Agyeman did not say she couldn't be, did not say she was hospitalized (that had been five years ago), and did not ask that the hearing be in New Jersey or anywhere else. Instead he asked for a month to arrange for her to be present. The IJ set a date four weeks later, for June 24, just to file the papers, and said they would pick a day then for Agyeman's wife to appear.

Yet another hearing was held July 28. Agyeman had the papers for the suspension of deportation, but not the money for the fee, so the judge asked the INS if it would waive the fee, and it did. Agyeman had not filed the required medical report for the adjustment of status application, and his wife was not present, so the judge denied it without prejudice to renewing it when Agyeman had the necessary supporting evidence. Before proceeding with the suspension of deportation part of the hearing, he told Agyeman that if he didn't qualify for the hardship suspension of deportation, he would give him another opportunity to seek a change of status on his wife's application, and time to "talk to your wife on the phone and have her come down here and testify on your behalf."

Agyeman didn't ask for any other arrangement relating to his wife. He did ask if he could have friends testify by telephone. The IJ said that "telephonic witnesses are allowed in some cases where the witness can establish an extreme hardship to coming out here to testify, but you need to get permission from me in advance." This is the advice the majority says should have been given. It was. The IJ noted that he would have them go to the INS office closest to them, present identification, and testify on the record from there. He also stated that the general rule was that the INS objected, and it was not usually allowed. Agyeman did not ask for any arrangement for his wife to testify by telephone from New Jersey, even though he had just been told that it was possible but disfavored. Had Agyeman asked, the IJ could have asked about

the wife's condition, perhaps obtained some verification, and decided whether to allow it.

Then the IJ considered hardship. The judge referred to his notes of the previous hearing where his wife's mental illness was mentioned, and asked whether she was confined to an institution. Agyeman said "occasionally she suffers a collapse when she's, when she would be admitted to hospital for periods like two or three months," but he indicated that "when she takes her medicine she's okay." Agyeman testified that he had only seen one episode of her illness while they lived in New Jersey, and "she normally lives on her own." When they both lived in New Jersey, she did not see a doctor on a regular basis, and would just get her prescription renewed when her medication ran out. Asked if his wife was presently institutionalized, he said, "I don't know." There's nothing here to justify the majority's claim that the IJ denied Agyeman due process by not arranging for the wife to testify from New Jersey.

Asked where his wife lived, Agyeman said, "I believe in New Jersey." She hadn't replied to his last two letters, and he had last talked to her six months before. He had been living in Carson City, Nevada, and his wife in New Jersey, for the last four years (since 1993). He said he preferred to run his business from Nevada because it was closer to Oakland, California, where his imports came into port. As to hardship, Agyeman merely testified, "I want to be reunited with my wife and she, it's my only marriage and the only person I am really very close to." However, when asked why he hadn't written the date of his marriage on his application, he said "I don't remember it exactly" but it was "in summer . . . around 1990,

1990, maybe, yeah, thereabout." Although he did know where his wife was born, when asked his wife's date of birth, he said, "she's about five years older than me. I think 53. I'm not really sure. I, I guess 53." The IJ then asked if Agyeman could say anything else to justify claiming hardship to himself or anyone else if he was deported, Agyeman said "it would be extremely difficult for me to begin in, in a, in Ghana at this time."

The IJ said that he would deny a hardship suspension, because nothing was shown except ordinary economic hardship,[2] but he would give Agyeman another opportunity to apply for adjustment of status. He told him how to arrange for a medical examination and report from a doctor approved by the INS and explained "you need to contact and have available at the next hearing your spouse." She needed to be present because he had "to determine whether there's a bona fide marriage and whether she still wants you to comfort her." Again, Agyeman didn't ask to have his wife testify by phone, or to have the hearing or part of it moved to New Jersey. He did ask for release on bond, but the IJ did not reduce the $5,000 bond, although he said Agyeman could apply for a reduction and show new facts. The IJ set the next hearing for September 17, almost two months later, to give Agyeman plenty of time to arrange for the medical report and his wife's presence, and said that even for the hardship suspension of deportation his adverse decision was not final. Agyeman then said he "might have to go for her" to get his wife there, because it would be hard to get her to fly to Arizona even if he got her on the phone. The judge said that he would "grant [Agyeman] continuances if [he was] working on something."

---

**2.** The common results of deportation, such as a potentially lower standard of living and fewer job opportunities, are insufficient to prove extreme hardship. *Perez v. INS,* 96 F.3d 390, 392 (9th Cir.1996).

Agyeman subsequently asked for another continuance, and got it, moving the hearing to November 5. At that hearing, more than eight months after his original detention, the IJ asked Agyeman if his wife was going to be present. Agyeman said, "She is in Phoenix," and then presented a motion for reduction of his bond. The IJ indicated that he would give him a written decision on the bond reduction later. He then asked Agyeman about his wife's location. Agyeman stated again that his wife was staying with some friends in Phoenix, and that she knew that the hearing would be "this week," but that she was not present because he hadn't been able to contact her again because of his detention. The IJ replied that Agyeman was given notice of the November 5 hearing on September 17, and that Agyeman was on notice that his wife needed to be present. The IJ then conducted the hearing without Ms. Levy. The IJ found that "failure to bring your spouse to testify today after as many continuances as you've been granted, constitutes a withdrawal or abandonment of your application for adjustment of status." The IJ then granted Agyeman voluntary departure. Agyeman reserved his right to appeal.

### Analysis

1. *Due Process*

There is no factual basis for the majority's decision. The majority opinion says that "the IJ's demand" that Ms. Levy travel to Arizona for Agyeman's adjustment of status hearing, to get him a green card as her spouse, "was fundamentally unfair in the circumstances."[3] The reason it was so "fundamentally unfair" as to deny Agyeman due process of law, according to the majority opinion, is that "[a] documented serious illness may constitute good cause

for a spouse's absence at the interview."[4] Well, of course it would, but so what? Why even mention that in this case? There is no evidence whatsoever in the record that Ms. Levy was hospitalized at any time relevant to the 1997 hearing, that she was regularly or repeatedly hospitalized, or that her illness in any way actually prevented her from traveling to Arizona. The BIA fairly and accurately took into account the evidence in the record as to Agyeman's wife's illness: "We recognize that respondent's wife suffers from some form of mental illness, which the respondent describes as bipolar." The only evidence before the IJ was that, not only was she *not* hospitalized, but *she had in fact traveled to Arizona.*

The majority opinion's assertion to the contrary presents a misleading characterization of the record. In his unsworn appeal brief to the BIA, which is *not* evidence and which was subsequent to his hearing, Agyeman said his wife had "found it unnecessary to travel from New Jersey" and that "her doctor has recommended against making the trip," but in his sworn testimony before the IJ, he testified, "She is in Phoenix." The majority opinion tries to muddy this clear declaration of fact in sworn testimony by quoting out of context Agyeman's testimony that "she should have arrived here last week" as though he was saying he didn't know if she was there. Agyeman testified, "She is in Phoenix," and presented a motion, not for any accommodation for his wife, but for a bond reduction for himself. After speaking to the motion, the judge said, "You said she's in Phoenix." Agyeman testified, "Yeah," and then made the remark the majority uses to try to create an ambiguity that isn't there. Following "Yeah [she's in

---

3. Majority at 880.

4. Majority at 881.

Phoenix]," Agyeman testified, "She should have arrived here last week. She would (indiscernible) staying with my friend.... She must be in Phoenix since last week." The uncertainty he testified to wasn't about whether his wife had traveled to Phoenix, but *when* she had arrived, and he explained the point of this by bringing the discussion back to his request for reduced bond and explanation that his confinement made it hard to contact her.

Now it may be the case that, as Agyeman claimed in his brief to the BIA, that his wife "found it unnecessary to travel" and that "her doctor has recommended against making the trip." Who knows? But he had told the IJ just the opposite, under oath. So the IJ had no reason to make his decision based on Agyeman's subsequent, unsworn claim. Yet the majority deems it unconstitutional for the IJ *not* to have accommodated Agyeman's wife based on this account that hadn't even been made, and that contradicted what Agyeman testified to.

The IJ was helping Agyeman just the way *Jacinto* said he should, trying to help him present evidence that would help him win if was entitled to win. Agyeman had obvious credibility problems. An exhibit showed he'd been arrested several times, most recently for a crime of dishonesty, and his marriage gave some indication of being a sham. The majority says that had the IJ been a better lawyer for Agyeman, he would have told him that his wife could appear by phone, or maybe that he could get the hearing moved to New Jersey, but the IJ did tell him he could ask for leave to have witnesses testify by phone. As for New Jersey, since Agyeman didn't ask for it, didn't claim that his wife couldn't travel, and testified that she was in Phoenix, it's hard to see why the IJ should be required

to have imagined that actually she was in New Jersey and couldn't travel to Arizona because of illness.

The majority cites *Jacinto*[5] for the proposition the majority articulates as the IJ's "obligation to assist"[6] Agyeman in determining what evidence was relevant. Actually, *Jacinto* held that the IJ should have "attempted to elicit more information," because failure to do so left the applicant (an asylum seeker) with testimony that was not credible, but might have been had the IJ "fully developed the record."[7] We put judicial officers in a difficult position when we require them to act as lawyers for the applicants, not just as neutral arbiters. Today's decision makes it impossible. The IJ in this case was doing just what we faulted the IJ in *Jacinto* for not doing. He was attempting to elicit more information that might have gotten Agyeman over the hump of a losing application.

The most captiously critical way to read the IJ's remarks, which is the way the majority opinion reads them, is that he was making up law that wasn't so and imposing it on Agyeman just to give him a hard, likely impossible, time. The fairer way to read the record is that the IJ was giving Agyeman every possible chance to avoid deportation, and helping him by telling him what would work. In this case, Agyeman's own testimony had shed so much doubt on the validity of the marriage, that nothing short of an effort by Ms. Levy personally to keep her husband in America would have convinced the IJ that the marriage was bona fide or that deportation would work a hardship on her. The INS lawyer had already suggested that the marriage Agyeman wanted to rely on was a sham, and there were reasons to suspect that. Among them: Agyeman hadn't lived with his wife for four years,

---

**5.** 208 F.3d 725 (9th Cir.2000).

**6.** Majority at 884.

**7.** 208 F.3d at 734.

didn't know when she was born or just when they were married, and hadn't been in touch with her for six months. But he needed to show merely that he had married Ms. Levy, "intending to live with her as her husband." [8] That was possible, but it was going to be hard to sell without the wife's testimony to corroborate it. Likewise, for hardship, the IJ had already concluded that he couldn't give a hardship suspension based on the economic hardship Agyeman would face if deported to Ghana, so he needed Ms. Levy to say it would be a hardship for her if her husband was deported.

Not only was this not a due process violation, but there is simply nothing wrong at all with a judge trying to help a pro se applicant like Agyeman by telling him what evidence could win his otherwise losing case. Because Agyeman gave no indication that his wife could not travel, and indeed he testified that she was in Arizona, the IJ's requirement was entirely reasonable. *Colmenar v. INS*[9] allows reversal on due process grounds where "the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." [10] Mr. Agyeman had ample opportunity to present his case.

Finally, the majority opinion's discussion of bipolar disorder is entirely misplaced. In order to derive the result it desires, the majority diagnoses and provides a prognosis and medical recommendation for a woman it has never examined. Even if it were appropriate for judges to diagnose patients for mental illness and provide medical recommendations regarding travel, which it obviously is not, there is nothing in the record to support the majority opinion's assumptions about this particular woman's condition. We have no medical records, just Agyeman's unsworn statement in his subsequent brief to the BIA about what his wife's physician supposedly said, which contradicts Agyeman's sworn testimony to the IJ about whether his wife traveled. What's more, if we're going to accept as true whatever Agyeman says about his wife's mental condition, even though he hasn't even seen her for six months, why not accept his statement that she ordinarily required neither hospitalization nor even attention from physicians, just renewal of her regular medication?

### 2. *Prejudice*

Additionally, the majority errs because even if it were correct on the due process theory that Agyeman's wife was institutionalized in New Jersey so it was fundamentally unfair to order that she appear in Arizona, Agyeman still could not get relief. He couldn't get the adjustment of status, because he still hadn't produced the medical report. It was required by law.[11] Agyeman knew it was required, and he never presented it. And he couldn't get the hardship suspension, because he hadn't testified to any hardship to anyone, not even his wife, even when the IJ asked for more hardship testimony. All he had was the inadequate testimony that it would be hard for him to start over again in Ghana.

### Conclusion

Because the IJ in this case did exactly what he was supposed to do, and because the majority opinion imposes excessive new burdens on immigration proceedings, I dissent.

**8.** *United States v. Tagalicud,* 84 F.3d 1180, 1185 (9th Cir.1996).

**9.** 210 F.3d 967 (9th Cir.2000).

**10.** *Id.* at 971.

**11.** CFR § 245.5.