**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GHILAMICHAEL ZEREZGHI; HURUIA
MESKEL, husband and wife,
*Plaintiffs-Appellants*,

v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES; MICAH
LYNN BROWN, Acting Field Office
Director; BOARD OF IMMIGRATION
APPEALS; WILLIAM P. BARR, United
States Attorney General; UNITED
STATES OF AMERICA,
*Defendants-Appellees.*

No. 18-35344

D.C. No.
2:17-cv-00879-
JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted July 11, 2019
Seattle, Washington

Filed April 14, 2020

Before:  Danny J. Boggs,* Marsha S. Berzon,

---

*The Honorable Danny J. Boggs, United States Circuit Judge for
the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

and Paul J. Watford, Circuit Judges.

Opinion by Judge Boggs

**SUMMARY**[**]

**Immigration**

In a case where the United States Citizenship and Immigration Service ("USCIS") denied an I-130 immediate relative visa petition on the ground that the non-citizen's prior marriage had been fraudulent, the panel reversed the district court's grant of summary judgment in favor of the government, and remanded, holding that the Board of Immigration Appeals violated due process by relying on undisclosed evidence and by applying too low a standard of proof.

Ghilamichael Zerezghi, a United States citizen, filed an I-130 petition on behalf of his non-citizen wife, Huruia Meskel. USCIS denied the I-130 petition under 8 U.S.C. § 1154(c), which provides that "no petition shall be approved" if USCIS determines that the noncitizen spouse previously entered into a marriage "for the purpose of evading the immigration laws." USCIS and the BIA relied, in part, on an apartment-rental application Meskel's former husband had previously submitted to USCIS. The application required him to list his past addresses, and neither of the two he listed were the marital residence that Meskel listed on her immigration paperwork. However, the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

agency never told Meskel and Zerezghi that it had used the application in making its fraud determination in their case.

The panel concluded that Zerezghi had a constitutionally protected interest in the grant of his I-130 petition, explaining that this court has previously held that a citizen petitioner has such a constitutionally protected interest because the approval of an I-130 petition is nondiscretionary.

Next, the panel held that the government's use of undisclosed records in making its marriage-fraud finding violated procedural due process. The panel concluded that the first factor set out by *Mathews v. Eldridge*, 424 U.S. 319 (1976)—the private interest affected by the government's action—favored the couple, explaining that: 1) a finding of past marriage fraud often means that the noncitizen spouse faces removal; 2) the right to marry and enjoy marriage are unquestionably liberty interests; and 3) the right to live with one's immediate family ranks high among individual interests. The panel also concluded that the third *Mathews* factor—the government's interest—favored the couple, explaining that the question here was not the government's interest in immigration enforcement, but its interest in not disclosing information on which it based its decision.

Next, the panel concluded that the second *Mathews* factor—the risk of an erroneous deprivation of the constitutionally protected interest and the probable value, if any, of additional or substitute procedural safeguards—also favored the couple. The panel explained that the couple had maintained that, if they had been given the rental application, they would have been able to refute (or at least attempt to refute) the allegation that Meskel's first husband lived at the addresses listed on the application instead of with her. Further, the panel concluded that the rental application was

the strongest piece of evidence against Meskel, and it was thus vital that Meskel and Zerezghi have been given an opportunity to rebut it.

Finally, the panel held that the BIA applied too low a standard of proof when it affirmed USCIS's marriage fraud determination. Under 8 C.F.R. § 204.2(a)(1)(ii), the agency can deny any immigration petition if there is "substantial and probative evidence" that the noncitizen has attempted or conspired to enter into a marriage to evade the immigration laws. The government argued this standard is equivalent to how courts deferentially review an agency's factual findings for "substantial evidence," and insisted that USCIS could deny any immigration application as long as there was evidence of marriage fraud, even if it was more likely than not that the marriage was bona fide.

The panel disagreed, observing that the "substantial and probative evidence" language seems similar to the "substantial evidence" standard, but clarifying that the latter is a standard of *review*, while the other is a standard of *proof*. The panel also explained that the BIA had recently held that, to be "'substantial and probative,' the evidence must establish that it is more than probably true that the marriage is fraudulent." Accordingly, the panel held that, given the seriousness of a marriage-fraud determination and the risk of a finding being made in error, the Constitution requires that the substantial-and-probative evidence standard be least as high as a preponderance of the evidence.

---

## COUNSEL

Robert Pauw (argued), Gibbs Houston Pauw, Seattle, Washington, for Plaintiffs-Appellants.

James J. Walker (argued), Trial Attorneyl Aaron S. Goldsmith, Senior Litigation Counsel; William C. Peachey, Director; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

---

**OPINION**

BOGGS, Circuit Judge:

Ghilamichael Zerezghi and Huruia Meskel used to be roommates. They lived in a shared house together but interacted little. After Zerezghi moved out, they became friends, and then started dating. Zerezghi proposed, but Meskel turned him down. A year later, Zerezghi tried again, and this time Meskel accepted. They married in 2013.

Zerezghi is a United States citizen and Meskel is a citizen of Eritrea. After the wedding, Zerezghi attempted to sponsor Meskel for permanent residency but the United States Citizenship and Immigration Services (USCIS) denied the application. This is Meskel's second marriage, and USCIS found that her previous marriage had been a sham, entered into "for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c). This finding would make her ineligible for any immigration benefit from her current marriage. *Ibid.* The Board of Immigration Appeals (BIA) affirmed the prior-marriage-fraud finding and, reviewing the BIA's decision under the Administrative Procedure Act, so did the district court.

We reverse. We hold that the BIA violated due process by relying on undisclosed evidence that Zerezghi and Meskel did not have an opportunity to rebut. In making its

initial determination of marriage fraud, the BIA also violated due process by applying too low a standard of proof. On remand, it must establish marriage fraud by at least a preponderance of the evidence before it can deny any subsequent immigration petition based on such a finding.

## I. Legal Background

When an American citizen marries a noncitizen, the citizen may petition for lawful permanent residency for the spouse. *See* 8 U.S.C. §§ 1151, 1154. To say that the process is complicated would be an understatement. The process begins when the citizen spouse files a Form I-130 Petition for Alien Relative (I-130), which acts as a request for immigration authorities to formally recognize the validity of the marriage. 8 C.F.R. § 204.1(a)(1). USCIS then conducts "an investigation of the facts" and adjudicates the petition. 8 U.S.C. § 1154(b). Once the I-130 petition is approved, the noncitizen spouse may apply for permanent residency, which—if successful—she receives only "on a conditional basis," and which can be revoked if the marriage is later found to be a fraud. *See id.* §§ 1255(a), 1186a(a)(1). The conditional permanent residency automatically expires after two years, and if the noncitizen wishes the status to become truly permanent, she must file a Form I-751 Petition to Remove Conditions on Residence (I-751). *Id.* §1186a(c)(1)(A). In addition to filing the I-751 petition, the couple must also appear together for an interview with USCIS. *Id.* § 1186a(c)(1)(B).

The noncitizen spouse's permanent residency becomes unconditional (truly permanent) at the end of two years if the I-751 petition is approved. *See id.* § 1186a(c)(3)(B). At all times during this process, the couple must maintain that they "married out of a bona fide desire to establish a life together," and must not have entered the marriage "to evade

immigration laws." *Agyeman v. INS*, 296 F.3d 871, 879 n.2 (9th Cir. 2002); *see also* 8 U.S.C. § 1361.

Separately, regardless of the strength of the current marriage, "no petition shall be approved" if USCIS determines that the noncitizen spouse *previously* entered into a marriage "for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c). This is a severe penalty in several ways. First, it applies "[e]ven if [the] current marriage is unquestionably bona fide." *Matter of Kahy*, 19 I. & N. Dec. 803, 805 n.2 (BIA 1988). Second, it is mandatory, not discretionary: If the noncitizen committed marriage fraud at any time in the past, "no petition shall be approved" at any time in the future. 8 U.S.C. § 1154(c). The penalty applies regardless of whether the past sham marriage resulted in a successful immigration petition. 8 C.F.R. § 204.2(a)(1)(ii). All that is required is that the noncitizen previously "sought" immigration benefits through a fraudulent marriage, or "attempted or conspired to" do so. *Ibid.* "[I]t is not necessary that the [noncitizen] have been convicted of, or even prosecuted for, the attempt or conspiracy." *Matter of Tawfik*, 20 I. & N. Dec. 166, 167 (BIA 1990).

How does USCIS determine whether there was marriage fraud? A USCIS regulation provides: "The director will deny a petition for immigrant visa classification filed on behalf of any alien for whom there is *substantial and probative evidence* of" an attempt or conspiracy "to enter into a marriage for the purpose of evading the immigration laws." 8 C.F.R. § 204.2(a)(1)(ii) (emphasis added). The initial burden of proof is on the government. *See Kahy*, 19 I. & N. Dec. at 806–07. In making its initial determination, the government often uses documents in its possession, interviews with the couple, and observations made during

site visits to the couple's marital residence. *See Matter of Singh*, 27 I. & N. Dec. 598, 600–01 (BIA 2019). If the government finds that there is "substantial and probative evidence" of marriage fraud, it issues a Notice of Intent to Deny the immigration petition. The burden then shifts to the petitioner to rebut that finding. *Kahy*, 19 I. & N. Dec. at 806–07. If the petitioner cannot rebut the charge to the BIA's satisfaction, the petition is denied.

## II. Factual and Procedural History

There is no dispute over whether Meskel and Zerezghi's current marriage is bona fide. Instead, the government insists that there is substantial and probative evidence that Meskel's first marriage to an American citizen was a sham. The government used this determination of prior marriage fraud to deny Zerezghi's I-130 petition that he filed on Meskel's behalf.

Meskel was born and raised in Eritrea. In 2003, when she was 21, her parents arranged for her to marry Tesfai Ghidei. Arranged marriages were common in their community, and Meskel and Ghidei married in Cairo in 2006. Ghidei, an American citizen, returned to the United States after the wedding, and Meskel followed a year later, after she obtained conditional permanent residency through the I-130 process. From here, accounts diverge.

According to USCIS, Meskel and Ghidei's marriage was a sham all along. It offered three reasons for this conclusion, which were accepted by the BIA in rejecting Meskel and Ghidei's I-751 petition. These three reasons also form the basis for the BIA's rejection of Meskel and Zerezghi's current I-130 petition.

First, there was documentary evidence that indicated that Meskel and Ghidei did not live together.  Meskel submitted records indicating that after she came to the United States, she lived in Edmonds, Washington with her sister and brother-in-law (the "marital residence").  However, Ghidei did not submit records that could verify that he also lived there.  Instead, Ghidei submitted records that linked him with different addresses, such as a tax return that listed a P.O. box and a rental application that listed two other addresses in Edmonds.[1]  Although Meskel submitted a joint lease that was signed by her and Ghidei, USCIS found it to be unreliable because it included dates that had been altered with white-out.  Second, Meskel provided inconsistent information regarding when she had last lived with Ghidei.  At a joint interview with USCIS in December 2009, Meskel and Ghidei told interviewers that they had lived together for the past two years and that they were still living together.  Then, in a follow-up April 2010 interview, Meskel—appearing without Ghidei—stated that she and Ghidei had been living separately since January 2010.[2]  Yet once USCIS sent a Notice of Intent to Deny the I-751 application, Meskel responded with a statement acknowledging that she had misled USCIS at her previous interviews; asserting that Ghidei had actually left the marital residence before the couple's December 2009 interview and that she had not had

---

[1] This rental application was never made available to Zerezghi or Meskel during their I-130 process and it forms the basis for the couple's procedural-due-process claim.

[2] During a January 2010 site visit to the couple's marital residence, USCIS officers found that their room contained no male belongings even though Meskel's brother-in-law (the couple's landlord) stated that Meskel and Ghidei were living together at the time.  It is unclear whether this site visit occurred before or after Ghidei purportedly left the marital residence.

any contact with him after April 2010. Both of these statements, though, were inconsistent with information contained in the couple's judgment for divorce, which indicated that Meskel and Ghidei had first separated on May 1, 2010. Finally, the BIA determined that Meskel had also given misleading information about whether she had any relatives living in the United States. In her December 2009 and April 2010 interviews, Meskel told investigators that she had no relatives in the United States and that her brother-in-law was merely her landlord. But Meskel's brother-in-law had appeared with her at the April 2010 interview to act as her translator, and her family later acknowledged that her brother-in-law had helped arrange her marriage to Ghidei and had even traveled to Egypt to witness it. Given the weight of these inconsistencies, USCIS concluded that none of the statements that Meskel and Ghidei made about their marriage could be fully credited. It therefore concluded that the two had not lived together as husband and wife in the United States and that the marriage was fraudulent.

The USCIS narrative contrasts starkly with Meskel's version of events. According to Meskel, a bona fide marriage swiftly deteriorated. According to her, she and Ghidei lived together and, in support, she submitted a joint tax return for 2008 and a voided check from a joint bank account. The couple also slept together, and Meskel wanted to have children. However, they began having problems only a few of months after moving in together in the United States. Ghidei would leave for several days or even weeks at a time and would not say where he had been when he returned. He began emotionally abusing Meskel by belittling her, often calling her stupid or criticizing her appearance. He withheld approval or affection as a form of punishment, and insulted Meskel's friends and family, driving them away. He also threatened her with deportation,

telling her that she was not an American citizen and had no rights. Eventually, Ghidei became physically abusive. Meskel stated that he would push and shove her and would even throw objects at her when he was unhappy. He would also refuse to help her when she needed medical attention.

Despite her situation, Meskel insists that she stayed with Ghidei after her arrival in the United States in 2007 and eventually, in 2009, she petitioned to remove the conditional status of her permanent residency. Ghidei helped her submit her application which, according to Meskel, indicated to her that he intended to stay in the marriage even though he had been talking about divorce. USCIS interviewed Meskel and Ghidei in December 2009 and visited the house listed as their marital residence in January 2010 as well as other addresses linked to Ghidei. However, as the BIA later noted in its opinion, USCIS officers observed no male belongings at the marital residence during their visit. Meskel explained that this was because Ghidei had left for a three-week trip to Eritrea earlier that month. When Ghidei returned from his trip in February, he told Meskel that he was no longer interested in her and the two then only saw each other a couple of times thereafter. Ghidei refused to go with Meskel to their follow-up interview with USCIS in April 2010, which explains why she attended the interview without him. Meskel also explained that many of her inconsistent statements made to USCIS investigators were made under pressure from Ghidei, who had told her to tell authorities that she did not have any relatives in the United States. She said that she deferred to Ghidei because he had handled all of her immigration paperwork since she arrived in the country, and because she had wanted the marriage to work out. However, given the abuse, Meskel and Ghidei formally separated in May 2010 and officially divorced on August 1, 2012 (though

the court backdated the decree *nunc pro tunc* to June 1, 2011).

Ultimately however, USCIS did not believe Meskel's version of the events and it denied her petition for removal of conditional permanent residency. Because Meskel's two years of conditional permanent residency had expired, she no longer had any legal status, and the Department of Homeland Security began removal proceedings against her. The Department initially alleged that Meskel had committed marriage fraud, but later withdrew that charge. An immigration judge ordered Meskel removed to Eritrea, but granted her request for withholding of removal.

Meskel and Zerezghi began dating shortly after her divorce with Ghidei was finalized, and they married on May 24, 2013. Zerezghi then filed an I-130 petition so that Meskel could make a new application for permanent residency. USCIS concluded that Meskel's first marriage had been a sham, and it denied the petition.[3]

Meskel and Zerezghi appealed to the BIA, which affirmed USCIS's denial of the I-130 petition, holding that there was substantial and probative evidence of "fraud in [Meskel's] first marriage." Meskel and Zerezghi then went to the district court, where they sought review of the BIA's decision under the Administrative Procedure Act. The district court granted summary judgment to the government, holding that the BIA applied the correct standard of proof,

---

[3] USCIS also found that Meskel and Zerezghi failed to establish that their current marriage is genuine. The BIA and the district court declined to reach this issue, so it is beyond the scope of our review. *Andia v. Ashcroft*, 359 F.3d 1181, 1184 (9th Cir. 2004) ("In reviewing the decision of the BIA, we consider only the grounds relied upon by that agency.").

that the proceedings before the agency complied with due process, and that substantial evidence supported its marriage-fraud finding. Meskel and Zerezghi timely appealed the district court's order.

## III.  Discussion

### A.  Standard of Review

Our review of the BIA's decision to impose a marriage-fraud penalty is governed by the Administrative Procedure Act. We must set aside the BIA's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review de novo whether the BIA violated procedural due process in adjudicating an I-130 petition (thereby acting "not in accordance with law"). *See Ching v. Mayorkas*, 725 F.3d 1149, 1155–59 (9th Cir. 2013).

### B.  Due-Process Framework

Zerezghi and Meskel contend that the government violated procedural due process when it determined that Meskel's prior marriage was fraudulent. First, they argue that USCIS's use of an apartment-rental application from Meskel's first husband to support its determination without first disclosing it to them was unconstitutional. Second, they argue that the BIA applied too low a standard of proof in making its determination of marriage fraud and that, on remand, the agency must apply a higher standard of proof.

The Due Process Clause of the Fifth Amendment requires that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. In determining whether a person's rights under that clause have been violated, the "standard analysis

. . . proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the [government] were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

The "threshold requirement" for Meskel and Zerezghi's claim to succeed is that they have "a liberty or property interest protected by the Constitution." *Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.*, 24 F.3d 56, 62 (9th Cir. 1994). We have held that a citizen petitioner has a constitutionally protected interest in the grant of an I-130 petition. *Ching*, 725 F.3d at 1156. This is because approval of an I-130 petition is nondiscretionary. By statute, the Secretary of Homeland Security "*shall*, if he determines that the facts stated in the petition are true and that the alien in behalf of whom the petition is made is an immediate relative . . . *approve the petition*[.]" *Id*. at 1155 (quoting 8 U.S.C. § 1154(b) (emphasis added)). "[D]eterminations that 'require application of law to factual determinations' are nondiscretionary," meaning that USCIS *must* approve an I-130 petition if the facts stated in the application are true and the beneficiary is an immediate relative. *Ibid*. (quoting *Hernandez v. Ashcroft*, 345 F.3d 824, 833–34 (9th Cir. 2003)). This administrative framework thus creates a "legitimate claim of entitlement" that is "grounded in the statute defining eligibility," rather than on a mere "unilateral expectation" for the petition's approval. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). As we explained in *Ching*, "as long as the petitioner and spouse beneficiary meet the statutory and regulatory requirements for eligibility" an "[i]mmediate relative status for an alien spouse is a *right* to which citizen applicants are entitled[.]" *Ching*, 725 F.3d at 1156 (emphasis added).

The government contends that the grant of an immigration petition is a privilege, and that because it has determined that Meskel committed marriage fraud on a prior occasion, Zerezghi is statutorily ineligible from succeeding on the I-130 petition on her behalf.  However, we squarely rejected this argument in *Ching*, noting that it "confuses the question of whether there is a protected interest in a benefit with the question of eligibility for that benefit."  *Ibid*. Because *Ching* established that the grant of an I-130 petition is a nondiscretionary, statutory, entitlement, Zerezghi is "entitled to the protections of due process" in insuring that the government determination of ineligibility was properly made. *Ibid*.

Individuals are necessarily entitled to a proper procedure to contest a government determination of ineligibility because "[v]irtually no government benefit is available to individuals without a requirement that certain conditions are met." *Ibid*.  For example, in *Goldberg v. Kelly*, the Supreme Court held that welfare recipients held an interest in the continued receipt of their benefits even if the government determined that they had become statutorily ineligible for them.  397 U.S. 254, 262–63 (1970).  Because the "benefits [were] a matter of statutory entitlement for persons qualified to receive them," the recipients were entitled to the protections of due process (in the form of a pre-deprivation hearing) to contest the government's determination of ineligibility.  *Id*. at 262; *see also Roth*, 408 U.S. at 577 (holding that the *Goldberg* plaintiffs "had not yet shown that they were, in fact, within the statutory terms of eligibility" but that the Court nonetheless "held that they had a right to a hearing at which they might attempt to do so").  In sum, because Zerezghi has a constitutionally protected interest in the grant of his I-130 petition, the main issue for us to decide

is whether the procedures followed by the government in not granting the petition were constitutionally sufficient.

## C. Use of Undisclosed Evidence

### 1. Background

When Meskel first applied for an I-751 petition (during her marriage with Ghidei) to remove the conditional status of her permanent residency, USCIS denied her petition based, in part, on an apartment-rental application that Ghidei had submitted in 2008. The application had required Ghidei to list his past addresses, and neither of the two that he listed were the marital residence that Meskel had put as her address on her immigration paperwork. Yet USCIS never made the rental application available to Meskel. When Zerezghi later applied for the couple's I-130 petition, USCIS apparently again relied on the application as a basis for concluding that Meskel's first marriage was a sham. However, the agency never told Meskel and Zerezghi that it used the application in concluding that there was "substantial and probative evidence" of marriage fraud. USCIS's Notice of Intent to Deny stated, in relevant part:

> [A]lthough [Meskel] claims that her [first] marriage was in good faith and that she and Mr. Ghidei did live together at her sister's house prior to their separation, USCIS records do not support such a finding, as Mr. Ghidei is not connected to the claimed address . . . . Rather, records indicate that Mr. Ghidei was living with his sister at another location during the relevant time period.

USCIS said nothing about the source or contents of these "records" and it refused Zerezghi and Meskel's request for

copies or more time to respond.[4]  It simply denied the I-130 petition.  Indeed, Meskel and Zerezghi only learned that these "records" referred to Ghidei's rental application from the BIA's opinion affirming USCIS's denial of the I-130 petition, well after any opportunity for them to respond had passed. *See Matter of Soriano*, 19 I. & N. Dec. 764, 766 (BIA 1988).  Even then, the government did not actually produce a copy of the application until it filed the administrative record in the district court in this current proceeding.

## 2.  Procedural-Due-Process Analysis

Meskel and Zerezghi contend that the government's use of undisclosed records like the rental application in making a determination of marriage fraud was unconstitutional.  We agree.

Since Zerezghi has a constitutionally protected interest in the grant of the I-130 petition, "we must then determine whether additional process was due." *Ching*, 725 F.3d at 1157.  Three factors guide the analysis:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

---

[4] The formal denial letter included a bit more information about the "records" in the form of a vague reference to the "testimony of the manager of Mr. Ghidei's previously associated address."  But it still did not mention the rental application, name the manager, describe his "testimony" in any way, or specify the "previously associated address."

administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). All three of these factors favor Meskel and Zerezghi.

*Ching* held that the first *Mathews* factor—the private interest affected by the government's action—favors the couple that filed an I-130 petition, for three reasons. First, a finding of past marriage fraud often means that the noncitizen spouse "faces imminent removal from the United States, thus undoubtedly causing immense hardship to herself and her husband." *Ching*, 725 F.3d at 1157. Second, "[t]he right to marry and to enjoy marriage are unquestionably liberty interests protected by the Due Process Clause." *Ibid.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Third, "[t]he right to live with and not be separated from one's immediate family is 'a right that ranks high among the interests of the individual' and that cannot be taken away without procedural due process." *Ching*, 725 F.3d at 1157 (quoting *Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982)). All three rationales apply with equal force in this case, and so the first *Mathews* factor favors Meskel and Zerezghi.

The third *Mathews* factor—"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail"—similarly favors the couple. *Mathews*, 424 U.S. at 335. The government interest in immigration enforcement in general is surely substantial. But the question here is not the government's interest in immigration enforcement but its interest in not disclosing the information on which it based its decision. As to that

interest, the government does not assert that the rental application is confidential or that its disclosure would be even minimally expensive. Indeed, the government's briefing does not contest that its interest in withholding the document would be quite low. Thus this factor, too, favors the couple.

The most contested *Mathews* factor in this case is the second one—"the risk of an erroneous deprivation of [the constitutionally protected] interest" and "the probable value, if any, of additional or substitute procedural safeguards." *Ibid*. Meskel and Zerezghi argue that USCIS's nondisclosure of the rental application during its decisionmaking process violated due process, and that the agency should have shared with them all documents upon which it based its determinations of marriage fraud prior to issuing its decision. The couple maintains that if they had known about the rental application, they would have researched the listed addresses, interviewed building managers, and used other methods to establish that Ghidei had not actually been living outside of the marital residence, but had only occasionally appeared at or patronized the other addresses.

We agreed with a very similar argument in *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015). The case involved a State Department program that allowed foreign citizens to visit the United States on cultural and educational exchanges. ASSE was an organization that found qualifying visitors, sponsored them for visas, and placed them with third-party host organizations. *Id*. at 1064–65. Under the program's rules, the State Department could sanction ASSE for any misconduct committed by the third-party host. *Id*. at 1065. One of the program's participants complained to the State Department about the conditions at her host

organization and, after an investigation, the Department "provided ASSE with a written Notice of Intent to impose sanctions." *Id.* at 1067. The notice named the host organization and the complaining program participant, and summarized that the participant reported "having endured almost 30 separate instances of harassment, threats regarding her immigration status, and threats to her family if she did not remain silent about the working conditions imposed by" the host. *Id.* at 1077. However, the Department never produced a transcript nor any notes from its interview with the participant. *Ibid.*

We held that the Department violated procedural due process by not providing ASSE with "complete interview notes" associated with the participant's complaint, because withholding such documents precluded ASSE from having "an opportunity to rebut the details of the harassment." *Ibid*. We reasoned that "had the Department given ASSE more details about [the] accusations" then ASSE "may have been able to produce evidence refuting them" and the evidence could "have affected the Department's decision as to the severity of sanctions, or whether to even impose sanctions at all." *Ibid.*

Meskel and Zerezghi's claim is similar to ASSE's. The couple contends that if they had been given the rental application, they would have been able to refute (or at least attempt to refute) the allegation that Meskel's first husband lived at the addresses listed on the application instead of with her. Importantly, the summary that the State Department issued in *ASSE* was much more specific than the one that USCIS issued to Meskel and Zerezghi, yet it was still constitutionally deficient. The State Department's summary provided details about the identity of the complainant, the parties involved, and the general contents of the allegations.

Here, by contrast, USCIS's Notice of Intent to Deny provided no crucial details and did not even list specific documents that USCIS had in its possession other than a vague reference to certain "records."  If the *ASSE* notice violated due process, then the much vaguer notice in this case did as well, especially in light of the harsh marriage-fraud penalty.

*Kaur v. Holder*, 561 F.3d 957 (9th Cir. 2009), reinforces this conclusion.  In *Kaur*, the BIA denied the plaintiff asylum by relying on classified information submitted by the Department of Homeland Security.  *Id.* at 960.  The Department gave Kaur a short summary of the classified evidence which stated, in part, that "reliable confidential sources have reported that Kaur has conspired to engage in alien smuggling; has attempted to obtain fraudulent documents; and has engaged in immigration fraud by conspiring to supply false documents for others."  *Ibid.* (internal quotation marks omitted).  We held that the BIA's "use of the secret evidence without giving Kaur a proper summary of that evidence was fundamentally unfair and violated her due process rights," noting that "Kaur cannot rebut what has not been alleged."  *Id.* at 961, 962.  Again, the same situation exists in our case: Zerezghi and Meskel, back in 2011, received a "conclusory and opaque" statement rather than "a proper summary" of the rental application.  *Id.* at 961–62.

The government has three responses.  First, USCIS had apparently informed Meskel back in 2011 about the rental application when it denied her application to remove the conditional status of her permanent residency during her marriage to Ghidei.  USCIS's denial of that application, dated December 10, 2011—approximately four years before Zerezghi filed the I-130 petition in this case—stated that

"officers visited the management office of the Alderwood Heights apartment complex" and that "[t]he manager of the apartment complex provided USCIS" with a copy of Ghidei's rental application. The denial then listed the previous addresses provided on the 2008 rental application. Thus, according to the government, Meskel and Zerezghi essentially had notice about the 2008 rental application and simply chose to not act on it.

However, the government's contention misconstrues Meskel and Zerezghi's argument. Even if the couple—actually only Meskel, as Zerezghi was not a party to the earlier proceeding—had access to a short description of the rental application buried within the files of a different proceeding that had ended years earlier, they still never had access to the actual document. The couple also had no way of knowing that the application summarized by USCIS in the previous proceeding was also what the agency had relied on in the *current* proceeding, because USCIS noted only that it had "records indicat[ing] that Mr. Ghidei was living . . . at another location during the relevant time period." It never specified what those "records" were, and did not specifically connect that statement to a specific rental application which, though mentioned in a previous proceeding, the couple had never been given. Put simply, USCIS's statement did not allow the couple to know what to investigate or what to rebut against. "Procedural due process requires that a party against whom an agency has proceeded be allowed to rebut evidence offered by the agency if that evidence is relevant." *Carnation Co. v. Sec'y of Labor*, 641 F.2d 801, 803 (9th Cir. 1981).

Next, the government contends the Notice of Intent to Deny put the couple on notice of the agency's conclusion that Ghidei had not been living at the marital home during

Meskel's first marriage.  But this argument contradicts *Kaur* and *ASSE*, for in both cases the government had issued documents that simply summarized findings without disclosing the underlying documents themselves.  In *Kaur*, the summary issued by USCIS put the asylum applicant on notice of the alleged smuggling and fraud, and the State Department document in *ASSE* put the company on notice of the accusations of misconduct against its host organization, but in neither case did the government agency divulge specific, rebuttable details about the situation or produce the underlying documents.  We held that the notices provided in both cases were constitutionally insufficient.  An agency cannot satisfy due process merely by giving notice of the conclusion it intends to reach.  In our case, the Notice of Intent to Deny was, "at best, conclusory and opaque."  *Kaur*, 561 F.3d at 961.  Since Meskel and Zerezghi did not have access to the rental application until after the administrative record had been filed in the district court, they "did not have a meaningful opportunity to rebut" the BIA's allegations, and thus the agency "did not afford [them] adequate procedural protections."  *ASSE*, 803 F.3d at 1079.

Finally, the government argues that the rental application was not the only evidence of Meskel and Ghidei living at different addresses while they were married.  But the evidence on this issue was mixed.  Unlike other marriage-fraud cases, there was no direct evidence indicating that Meskel and Ghidei's marriage was a sham.  *See Singh*, 27 I. & N. Dec. at 610; *Kahy*, 19 I. & N. Dec. at 805; *cf. Simko v. B.I.A.*, 156 F. Supp. 3d 300, 312 (D. Conn. 2015) (noting that where there was "no direct evidence that Simko's marriage . . . was fraudulent," it was arbitrary and capricious to conclude that there was "substantial and probative evidence" of marriage fraud).  Instead, numerous declarants swore that although Ghidei would often leave for long periods of time,

he and Meskel lived together as husband and wife. Meskel also submitted joint rent receipts and a joint lease agreement. Granted, Meskel made inconsistent statements during the immigration process, but she explained that they were made at the instruction of Ghidei and in deference of his desire to supervise the process. With the rest of the record equivocal, the rental application was the strongest piece of evidence that Meskel and her first husband lived separately. It was thus vital that Meskel and Zerezghi have been given an opportunity to rebut it.

All three *Mathews* factors favor Zerezghi and Meskel. We hold that the BIA violated due process by not disclosing the rental application to the couple before denying the I-130 petition on the basis that Meskel had committed prior marriage fraud. Given the harsh effects of a marriage-fraud determination, Zerezghi and Meskel are entitled to at least the complete administrative record on which USCIS and the BIA relied in reaching its determinations, including any and all documents that the couple were not given prior to the agency making its decisions. Indeed, it is an "immutable" principle of due process "that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene v. McElroy*, 360 U.S. 474, 496 (1959); *see also Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995) (holding that the "use of undisclosed information in adjudications should be presumptively unconstitutional"). Because Meskel and Zerezghi received only a vague reference to unspecified "records," they had no meaningful opportunity to respond to the apartment-rental application before USCIS made its determination. This violated procedural due process.

## D. Standard of Proof Required to Establish Marriage Fraud

Meskel and Zerezghi also contend that the BIA applied too low a standard of proof when it affirmed USCIS's marriage-fraud determination and that, on remand, the agency must apply a more stringent standard. We agree.

Under a USCIS regulation, the agency can deny any immigration petition if there is "substantial and probative evidence" that the noncitizen "has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws." 8 C.F.R. § 204.2(a)(1)(ii). The government acknowledges that it bears the initial burden of proof. If it produces substantial and probative evidence of marriage fraud, the burden shifts to the petitioner to rebut the allegation. *Kahy*, 19 I. & N. Dec. at 806–07. In the government's view, "substantial and probative evidence" requires much less than a preponderance of the evidence. In its briefing and at oral argument, the government argued that the standard is equivalent to how courts deferentially review an agency's factual findings for "substantial evidence," only that in this instance, it is applicable to initial determinations of marriage fraud.[5] The government insists that this

---

[5] To support its position, the government cited several district court opinions that have seemingly used the "substantial and probative evidence" and the "substantial evidence" standards interchangeably. *See Yu An v. Napolitano*, 15 F. Supp. 3d 976, 981 (N.D. Cal. 2014); *Zemeka v. Holder*, 989 F. Supp. 2d 122, 130–31 (D.D.C. 2013). However, these cases involved situations in which the evidence of marriage fraud was so overwhelming that a precise articulation of the standard of proof was unnecessary. For example, in *Yu An*, the petitioner signed an affidavit admitting that his marriage to the beneficiary was a sham, and that he had never had a relationship with his purported wife. *Yu An*, 15 F. Supp. 3d at 979. In *Zemeka*, USCIS denied an I-130 petition after it determined

empowers USCIS to deny any immigration application as long as there was evidence of marriage fraud, even if it was more likely than not that the marriage was bona fide. This is incorrect.

Although the "substantial and probative evidence" language in the USCIS regulation seems similar to how courts review formal agency adjudications for "substantial evidence," the two are not the same. One is a standard of *review*, while the other is a standard of *proof*.[6] Further background on the two standards makes this clear.

"The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how *courts* are to review agency factfinding." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *T-Mobile South, LLC v. Roswell*, 135 S. Ct. 808, 815 (2015)) (emphasis added). It is an

---

that the beneficiary had previously been married to an American woman who had married a different noncitizen in the same month that she married the beneficiary. *Zemeka*, 989 F. Supp. 2d at 131. That woman filed immigration petitions for both noncitizens, but then failed to appear for any subsequent hearings and also failed to respond to the agency's Notice of Intent to Deny. *Ibid*. The facts in these cases indicate that even if the correct standard of proof was a preponderance of the evidence, the government would have met it. Thus, the need for a clear articulation of the substantial-and-probative-evidence standard was low. However, the facts in our case present a much closer call.

[6] As the Supreme Court has noted, the distinction between an initial burden of proof and the standard of review is best illustrated in criminal law, where a finding of guilt must be established beyond a reasonable doubt, but an appellate court reviews only whether that judgment is supported by sufficient evidence. *See Woodby v. INS*, 385 U.S. 276, 282 (1966). Here, the immigration judge or BIA must find that there was marriage fraud by "substantial and probative evidence" but, on review, the appellate court must examine whether there was "substantial evidence" to support the finding.

extremely lenient standard that asks courts to consider only whether the administrative record "contains 'sufficien[t] evidence' to support the agency's factual determinations." *Ibid.* (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "more than a mere scintilla" of evidence, but a court will sustain a determination as long as there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Ibid.* (citation omitted).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  *Ibid*.  In the immigration context, the substantial-evidence standard means that a reviewing court "must affirm the BIA's order when there is such relevant evidence as reasonable minds might accept as adequate to support it, *even if it is possible to reach a contrary result on the basis of the evidence*."  *Oropeza-Wong v. Gonzales*, 406 F.3d 1135, 1147 (9th Cir. 2005) (emphasis added).

In contrast, the substantial-and-probative-evidence standard is a standard of *proof*, not of review.  Although the phrase has never been included in any immigration statute, it is stated in the agency regulation governing eligibility for immigration petitions as the evidentiary standard for establishing marriage fraud.[7]  *See* 8 C.F.R. § 204.1(a)(1)(ii).  The phrase first appeared in a 1978 BIA opinion that held that a denial of an immigration application based on a finding of marriage fraud "must be based on evidence that is substantial and probative."  *Matter of Agdinaoay,* 16 I. & N. Dec. 545, 546 (BIA 1978).  The opinion did not elaborate on what level of proof—or what type of evidence (direct or circumstantial)—would satisfy the standard, stating only

---

[7] The phrase was first included in the regulation governing Section 204 of the Immigration and Nationality Act in 1992, two years after the BIA decided *Matter of Tawfik*, 20 I. & N. Dec. 166 (BIA 1990).

that "a factual determination based on clear, convincing, and unequivocal evidence" would suffice. *Id*. at 547; *see also Kahy*, 19 I. & N. Dec. at 805 (concluding that "clear and convincing" evidence is enough to sustain a finding of marriage fraud).

The standard was again invoked in *Matter of Tawfik*, which held that a mere "reasonable inference [of marriage fraud] does not rise to the level of substantial and probative evidence[.]" 20 I. & N. Dec. at 168. In *Tawfik*, the only evidence that indicated marriage fraud was that the beneficiary had divorced his first citizen wife a little over a year after they had married. *Id*. at 169. Despite the existence of a divorce decree that averred that the couple were married and had lived together, the factfinder apparently relied on inferences from facts that were not in the record when denying the petition. *Id*. at 170. On appeal, the BIA held that this inference alone was insufficient for establishing "substantial and probative" evidence of fraud and thus vacated the finding. *Id*. at 167.

After oral argument in our case, the BIA recently again addressed the standard in *Matter of Singh*, which held that "to be 'substantial and probative,' the evidence must establish that it is more than probably true that the marriage is fraudulent." 27 I. & N. Dec. 598, 607 (BIA 2019). Importantly, the BIA explained that "substantial and probative evidence" is a "standard of proof" which "refers to the quality and quantity of competent, credible, and objective evidence." *Id.* at 606. "Whether the evidence in any given case is sufficiently substantial and probative to support a finding of marriage fraud will depend upon the factual circumstances of each case." *Id*. at 607.

In *Singh*—a situation in which the beneficiary was the petitioner's father, and who, at the time of filing for

immigration benefits, was married to the petitioner's maternal grandmother—the BIA determined that there was "substantial and probative evidence" of marriage fraud based on a variety of factors. For example, during an interview with the beneficiary's wife, at the marital residence, the wife "admitted that she married the beneficiary as a favor to her daughter," the petitioner's mother, "to allow [the beneficiary] to remain in the United States." *Id*. at 600. The BIA held that "[a] sworn statement by the parties admitting that the marriage is fraudulent . . . is direct evidence of fraud that is 'substantial and probative.'" *Id*. at 607. But that was not the only evidence to support its finding. Observations made by USCIS officers during the visit also indicated that the beneficiary slept in the master bedroom with his wife's daughter, rather than with his wife. *Id*. at 610. The BIA held that, together, these facts served to constitute substantial and probative evidence of marriage fraud.

The exegeses offered by these BIA opinions makes it clear that the substantial-and-probative-evidence standard is a standard of proof, which is at least as high as a preponderance of the evidence. We see no reason for departing from this conclusion. Although a determination of marriage fraud does not implicate as fundamental a right as, for example a civil commitment, *see Jones v. United States*, 463 U.S. 354, 361 (1983); a loss of parental rights, *see Troxel v. Granville*, 530 U.S. 57, 67 (2000); or an order of removal, *see Padilla v. Kentucky*, 559 U.S. 356, 365 (2010), it is nevertheless a harsh penalty, limiting the noncitizen's ability to obtain future immigration benefits and putting her at risk of removal. On remand, the BIA can reexamine the permissible interpretation of the words of its regulation. We hold only that, given the seriousness of a marriage-fraud determination and the risk of a finding being made in error,

the Constitution requires at least a preponderance of the evidence before imposing this sanction.

## IV. Conclusion

We **REVERSE** the order of the district court, and **REMAND** to the BIA for further proceedings in accordance with this opinion.