**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| NSHAN AYANIAN, *Petitioner,* v. MERRICK B. GARLAND, Attorney General, *Respondent.* | No. 16-70809 <br><br> Agency No. A077-310-327 <br><br> OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted September 19, 2022
Pasadena, California

Filed April 3, 2023

Before: Danny J. Boggs,[*] Kim McLane Wardlaw, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Wardlaw

---

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

**SUMMARY**[**]

**Immigration**

The panel denied Nshan Ayanian's petition for review of a decision of the Board of Immigration Appeals (BIA) denying his untimely and numerically barred second motion to reopen, and denied the parties' joint request to send this case to mediation in order to put the appeal into abeyance while Ayanian pursued other forms of relief from removal.

Ayanian unsuccessfully sought asylum and related relief based on his fear of conscription into the Armenian military and his fear of money lenders to whom he owed money. He also previously sought reopening based on changed country conditions consisting of evidence that some people over the draft age of 27 were being called for military service by the Armenian government. As to the BIA's denial of Ayanian's first motion to reopen, this court held that it was not irrational, arbitrary, or contrary to law for the BIA to deny reopening because Ayanian failed to show that the Armenian government would consider him to be either a draft evader or a conscript, or that the Armenian government would acquiesce to future torture.

In the present motion to reopen, Ayanian again sought reopening based on changed country conditions consisting of the war between Nagorno-Karabakh and Azerbaijan, and escalating tensions between Armenia and Azerbaijan. Other than noting these changed circumstances, Ayanian raised the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

same issues he had raised in his unsuccessful first motion to reopen, and again claimed that he feared persecution on account of his past evasion of military service and also feared being conscripted into the military. The panel observed that on appeal, Ayanian did not identify any relevant changed country conditions, and conceded that at age 47, he is currently likely beyond draftable age. The panel wrote that Ayanian's repeated allegations that the Armenian authorities are punishing individuals who evaded the draft in the past, which this court previously found insufficient for reopening, did not establish that he now has a legitimate claim for persecution based on his past evasion of military service.

At oral argument, Ayanian's counsel conceded that Ayanian's second motion to reopen lacked merit. Ayanian instead sought a means of holding his removal in abeyance until he obtained lawful permanent resident status. Although United States Citizenship and Immigration Services (USCIS) had approved his mother's and sister's I-130 visa petitions filed on his behalf, Ayanian was awaiting his priority date to become current, which would then allow him to submit an I-485 application for adjustment of status. Government counsel indicated that the government was not in a position to offer Ayanian any relief, but later suggested that the case be placed in mediation, which would give the Department of Homeland Security more time to consider whether it would exercise prosecutorial discretion to give Ayanian relief. Ayanian joined in this request. The panel noted that even after Ayanian filed an I-485 application, it would take time for USCIS to process that application and determine whether he had met the various statutory and regulatory requirements for adjustment of status, and whether the application should be granted as a

matter of discretion, a process that would likely last for at least another year, and potentially much longer.

Because Ayanian conceded that the dispute involving his motion to reopen lacked merit, the parties had not indicated that transferring the matter to mediation would advance Ayanian's adjustment-of status process, and the parties had not explained how a mediator's assistance in negotiating, defining the relevant issues, or exploring alternatives would assist Ayanian in achieving his goal, the panel concluded that Ayanian's petition for review was not the sort of dispute that was appropriate for mediation. The panel observed that the parties had not disguised the fact that the objective of transferring the matter to mediation was to delay Ayanian's removal from the country until the government had agreed to provide discretionary relief. The panel wrote that it was an abuse of the court's mediation process to use it for a purpose unrelated to resolving disputes and as a substitute for the issuance of a stay. The panel additionally noted that the government had numerous means to avoid enforcement against Ayanian, including specific procedural tools to hold Ayanian's case in abeyance, such as remanding the matter to the BIA, moving to reopen proceedings with the BIA or to dismiss the proceedings, requesting a continuance from the BIA, or simply deciding not to execute Ayanian's final order of removal—decisions which are the prerogative of the Executive Branch, not the judiciary. Thus, the panel denied the motion to refer to mediation.

Judge Wardlaw concurred with the majority's reasoning and conclusion on the merits of Ayanian's second motion to reopen, but dissented from the majority's denial of the parties' joint request to refer this case to mediation. Judge Wardlaw wrote that mediation is an effective tool to fully, fairly, and efficiently resolve certain immigration cases, and

that the court should not be reticent in a proper case to use it—especially when the government itself joins in such a request. Judge Wardlaw noted that Ayanian's family members had filed a visa petition on his behalf over 15 years ago, and since that time, Ayanian has dutifully waited in line and neither engaged in nor been convicted of any conduct that would render him inadmissible. Judge Wardlaw wrote that even though Ayanian was finally within striking distance of a green card, his case, like those of the millions of noncitizens backlogged in the immigration courts or seeking relief before USCIS, was snarled in bureaucratic proceedings through no fault of his own. In Judge Wardlaw's view, faced with the extraordinary sanction of removal, boxed in by a broken immigration system, the request for a referral to mediation was not unreasonable.

## COUNSEL

Judith L. Wood (argued), Law Office of Judith L. Wood, Los Angeles, California, for Petitioner.

Brooke M. Maurer (argued), Trial Attorney; Carl McIntyre, Assistant Director; Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

IKUTA, Circuit Judge:

Nshan Ayanian petitions for review of an order by the Board of Immigration Appeals (BIA) denying his second motion to reopen removal proceedings. But Ayanian's more pressing concern, as explained in oral argument, is to avoid a decision on the merits of this petition for review until he has successfully obtained relief from removal. To do so, he joins the government's request to transfer this matter to mediation. We deny Ayanian's petition for review on the merits. We also deny the joint request to send this case to mediation in order to put the appeal into abeyance while Ayanian pursues other forms of relief from removal. In the matter before us, it is the role of the Executive Branch—not the judiciary—to allow Ayanian to remain in the country while he seeks further relief.

I

Ayanian was born in Armenia in 1969, when it was still a constituent republic of the Soviet Union. When he was 17, he was drafted into the Soviet Army and served two years of compulsory service. Following the collapse of the Soviet Union in 1991, the Republic of Armenia became an independent state. The new Armenian government ordered young people to serve in the Armenian army. After reading several newspaper articles about abuses and crimes against service members committed by military leaders, Ayanian refused to join the military and hid from the officers who came by his parents' home to recruit him. He fled to Russia in 1995 and was admitted to the United States in 1996 on a one-year nonimmigrant visitor visa.

Ayanian overstayed his nonimmigrant visa, and in May 2000, the government issued a Notice to Appear (NTA), charging him with being removable for remaining in the United States longer than permitted.  *See* 8 U.S.C. § 1231(a)(1)(B).  Ayanian admitted the allegations in the NTA and conceded removability.  He subsequently filed an application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).  At his merits hearing in 2001, Ayanian testified regarding his service in the Soviet Army, his fear of being recruited into the Armenian military, the poor living conditions in Armenia, and his fear of unnamed money lenders to whom he owed $800.

The Immigration Judge (IJ) issued an oral decision denying Ayanian's applications for relief.  The IJ held that Ayanian was statutorily ineligible for asylum because his application was untimely, having been filed more than one year after the date of his arrival in the United States, *see* 8 U.S.C. § 1158(a)(2)(B), and Ayanian had not demonstrated the applicability of an exception to this deadline. The IJ next ruled that Ayanian was not entitled to withholding of removal, because he failed to establish past persecution or a well-founded fear of future persecution on account of a protected ground.  *See* 8 U.S.C. § 1231(b)(3).  The IJ also held that Ayanian was not entitled to CAT relief because he failed to establish that any government official would consent or acquiesce to his torture by the lenders to whom Ayanian owed money.  *See* 8 C.F.R. § 208.18(a)(1).  In connection with these rulings, the IJ found that Ayanian was not credible.  Finally, the IJ granted Ayanian voluntary departure.  In 2003, the BIA affirmed the IJ's decision in full.

In 2006, we denied in part and dismissed in part Ayanian's petition for review. *See Ayanian v. Gonzales*, 165

F. App'x 520 (9th Cir. 2006). We held that we lacked jurisdiction to review the IJ's determination that Ayanian was statutorily ineligible for asylum and that the IJ's denial of Ayanian's withholding of removal and CAT claims was supported by substantial evidence. *Id.* at 521.

Four years later (and more than nine years after the IJ's ruling in his immigration proceedings), Ayanian filed a motion to reopen his proceedings in light of changed country conditions in Armenia. In his brief to the BIA, Ayanian cited reports from 2001 and 2002, which indicated that some people over the draft age of 27 were being called for military service by the Armenian government, some conscripts suffered abuse and ill-treatment, and laws allowed draft evaders to be punished. The reports also demonstrated the presence of organized crime connected to corrupt government officials. Based on these reports, Ayanian claimed that he had presented a prima facie case for asylum and withholding due to changed conditions.

The BIA denied Ayanian's motion to reopen in January 2011, holding that Ayanian had not shown changed circumstances in Armenia that were material to his claims of asylum and withholding. The BIA held that Ayanian, who was then 41, had not made a prima facie showing either that he would be conscripted into the military at his age or punished for past draft evasion. The BIA also concluded that the reports on which Ayanian relied did not show that the government would accede to his torture by money lenders.

Almost five years later, in 2015, we denied in part and dismissed in part Ayanian's petition for review of the BIA's denial of his motion to reopen. *See Ayanian v. Lynch*, 616 F. App'x 321 (9th Cir. 2015). We held that, "[w]hile Ayanian's evidence suggests mistreatment of both draft

evaders and military conscripts, it was not irrational, arbitrary, or contrary to law for the BIA to conclude that he did not show that the Armenian government would consider him to be either a draft evader or a conscript." *Id*. at 321–22 (internal quotations and citation omitted). We also affirmed the BIA's conclusion that Ayanian failed to show that the Armenian government would acquiesce to future torture. *Id.* at 322. In 2016 (more than fifteen years after the proceedings before the IJ), Ayanian filed a second motion to reopen the proceedings, which is the subject of this petition. The motion stated that a war was pending "between Nagorno-Karabakh and Azerbaijan," and that tensions between Armenia and Azerbaijan had escalated. Other than noting these changed circumstances, Ayanian raised the same issues he had raised in his unsuccessful first motion to reopen, and again claimed that he feared persecution on account of his past evasion of military service and also feared being conscripted into the military.

The BIA denied the second motion as untimely and number-barred. The BIA concluded that, although Ayanian's evidence showed changed country conditions (the outbreak of hostilities between Armenia and Azerbaijan), these new circumstances were immaterial to his asylum and withholding claims because they did not show a "reasonable probability" that "the Armenian Government might try to conscript a 47-year-old man into military service, or punish him for not serving." The BIA also concluded that his motion did not show changes material to his claim for CAT relief.

In March 2016, Ayanian timely filed a second petition for review, this time appealing the BIA's denial of his second motion to reopen. After this appeal had been pending for five years, Ayanian filed a motion in our court to stay

appellate proceedings for 180 days "to allow time to examine grounds for a possible alternative to litigation in this case." The motion discussed Ayanian's efforts to adjust his status to become a lawful permanent resident, as explained in more detail below. According to the motion, Ayanian's mother and sister had each submitted a Form I-130 (Petition for Alien Relative) on Ayanian's behalf to the U.S. Citizenship and Immigration Services (USCIS), and the USCIS had approved those petitions. Therefore, the motion explained, Ayanian would be eligible to adjust status once a visa number was available (one of the steps in obtaining lawful permanent resident status), "which is anticipated in the near future." We granted the motion and stayed appellate proceedings until May 2, 2022.

In June 2022, Ayanian filed a second motion to stay appellate proceedings for 180 days. Ayanian claimed that because the I-130 petitions submitted by both his mother and sister had been approved, and a visa number was available,[1] he "might be eligible to adjust status to that of LPR [lawful permanent resident]," or be able to obtain similar relief by leaving the country and applying to a United States consulate. Ayanian requested the stay so that he could "seek Prosecutorial discretion in the form of Judicial administrative closure" with the Department of Homeland Security (DHS). We denied Ayanian's second motion to stay because the "interests of judicial efficiency" weighed in favor of deciding Ayanian's second petition for review, which had then been pending for six years.

---

[1] This was a misstatement. Ayanian's visa priority date was not current as of June 2022, when Ayanian filed his second motion to stay.

At oral argument, Ayanian's counsel conceded that Ayanian's second motion to reopen lacked merit.**[2]** Ayanian instead sought a means of holding his removal in abeyance until he had obtained lawful permanent resident status. Counsel claimed that Ayanian was making progress in obtaining that relief because the date when he would be eligible to file for a visa application was "only a few months away."

In response, government counsel indicated that the government was not in a position to offer Ayanian any relief. The government could not confirm that a visa number would be available for Ayanian within the near future because there are "so many people in line" for a visa. Nor could the government "give a definitive answer" as to when Ayanian would be eligible to apply for adjustment of status. Further, according to counsel, DHS construed Ayanian's request that the government exercise prosecutorial discretion to refrain from removing Ayanian as a request for a joint motion to reopen his immigration proceedings before the BIA. In light of DHS's backlog, the government would not be able to consider such a request for 12 to 18 months. Government counsel speculated that DHS might agree to enter a temporary stay of removal, but stated "that's not something I have the authority to give you right now." But government

---

[2] Court: Are you conceding that you don't have an argument on the merits?

Counsel for Ayanian: In a sense, yes. I would fall on the mercy of the Court and let this case trail until in fact he can get a green card rather than litigate the merits of the case, yes. https://www.ca9.uscourts.gov/media/video/?20220919/16-70809/ at 9:47 to 10:20

counsel also could not say whether DHS would actually take steps to have Ayanian removed.

Turning to the availability of judicial relief, government counsel stated that she understood why we had denied the motion to stay appellate proceedings, given the age of the case, and she also noted that our decision in *Sarkar v. Garland*, 39 F.4th 611 (9th Cir. 2022), made it unlikely that a motion for judicial administrative closure of Ayanian's case would succeed. Therefore, government counsel suggested for the first time that the case be placed in mediation, which would give DHS more time to consider whether it would exercise prosecutorial discretion to give Ayanian relief.

## II

We first consider Ayanian's appeal of the BIA's denial of his second motion to reopen. We have jurisdiction to consider Ayanian's petition to review the denial of his second motion to reopen under 8 U.S.C. § 1252. We review the BIA's denial for abuse of discretion, *see Hernandez-Ortiz v. Garland*, 32 F.4th 794, 800 (9th Cir. 2022), and reverse only if the BIA's decision was "arbitrary, irrational, or contrary to law," *Silva v. Garland*, 993 F.3d 705, 718 (9th Cir. 2021).

"Motions to reopen are disfavored due to the 'strong public interest in bringing litigation to a close.'" *Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1150 (9th Cir. 2010) (per curiam) (quoting *INS v. Abudu*, 485 U.S. 94, 107 (1988)). Generally, "[a]n alien may file one motion to reopen proceedings," 8 U.S.C. § 1229a(c)(7)(A), and must file it "within 90 days of the date of entry of a final administrative order of removal," 8 U.S.C. § 1229a(c)(7)(C)(I). However, "[t]here is no time limit on the filing of a motion to reopen"

when the motion "is based on changed country conditions arising in the country of nationality or in the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii); *see also Hernandez-Ortiz*, 32 F.4th at 804.

To prevail on a motion to reopen based on changed country conditions: (1) a petitioner must "produce evidence that conditions had changed" in the country of removal; (2) "the evidence [must] be material"; (3) "the evidence must not have been available and would not have been discovered or presented at the previous proceeding"; and (4) "the new evidence, when considered together with the evidence presented at the original hearing, would establish prima facie eligibility for the relief sought." *Toufighi v. Mukasey*, 538 F.3d 988, 996 (9th Cir. 2008). "The critical question is . . . whether circumstances have changed sufficiently that a petitioner who previously did not have a legitimate claim now does." *Agonafer v. Sessions*, 859 F.3d 1198, 1204 (9th Cir. 2017) (cleaned up).

Because Ayanian filed the second motion to reopen at issue in this appeal nearly 15 years after he was ordered removed by an IJ, and over five years after he filed his first motion to reopen, his second motion to reopen is untimely and number-barred unless the exception for changed country conditions applies. On appeal, Ayanian does not identify any relevant changed country conditions, and concedes that at age 47, he is currently likely beyond draftable age. Rather, he repeats his allegations that the Armenian authorities are punishing individuals who evaded the draft in the past. Ayanian presents no new evidence to support this claim, instead relying on the same evidence that he cited in his first

motion to reopen. We previously found such evidence insufficient, *see Ayanian*, 616 F. App'x at 321–22, and that is the law of the case, *see Gonzalez v. Arizona*, 677 F.3d 383, 390 n.4 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). Thus, Ayanian's second motion to reopen fails for the same reason as his first: his failure to establish that "circumstances have changed sufficiently [such] that [where he] previously did not have a legitimate claim" for persecution based on past evasion of military service, he now does. *Agonafer*, 859 F.3d at 1204 (cleaned up).

## III

We next consider Ayanian's request not to rule on his petition for rehearing until he successfully adjusts his status to that of a lawful permanent resident. We previously denied Ayanian's second motion for a stay of appellate proceedings, and the parties do not request administrative closure. *See Sarkar*, 39 F.4th at 617. Therefore, the only request before us is a request to transfer this appeal to mediation until the DHS issues a stay of removal or adjudicates Ayanian's application for lawful permanent residency. In order to evaluate the scope of Ayanian's request that his case be held in abeyance pending a favorable ruling on his application for adjustment of status, it is necessary to understand the adjustment-of-status process and its time frame.

## A

Adjustment of status is the process whereby aliens already in the United States seek to change their immigration status from non-immigrant (such as a student or temporary worker) to lawful permanent resident. *See Scialabba v.*

*Cuellar de Osorio*, 573 U.S. 41, 46 n.1 (2014).[3]
"Adjustment of status is an extraordinary remedy to be
granted only in meritorious cases." *Kim v. Meese*, 810 F.2d
1494, 1498 (9th Cir. 1987).   Aliens who complete this
process become lawful permanent residents, which allows
them to live and work permanently in the United States. *See
Barton v. Barr*, 140 S. Ct. 1442, 1445 (2020).

Becoming a lawful permanent resident is a multi-step
undertaking.  Before an alien can even apply for adjustment
of status, the alien must complete the difficult and lengthy
process of obtaining a visa number. *See Zerezghi v. USCIS*,
955 F.3d 802, 804 (9th Cir. 2020) ("To say that the [visa]
process is complicated would be an understatement.").
Congress has imposed numerical limits on categories of
aliens who may be admitted into the United States for
permanent residence.   *See* 8 U.S.C. § 1151(a).   These
categories include specified "immediate relatives" of U.S.
citizens, to whom "[v]isas are always immediately
available," *Tovar v. Sessions*, 882 F.3d 895, 897 (9th Cir.
2018), as well as five other family-preference categories for

---

3  Aliens located outside of the United States must "apply for a[n]
[immigrant] visa by submitting the required documents and appearing at
a United States Embassy or consulate for an interview with a consular
officer." *Kerry v. Din*, 576 U.S. 86, 89 (2015) (plurality) (citing 8 U.S.C.
§§ 1201(a)(1), 1202).   "An alien already in the United States—for
example, on a student or temporary worker visa—must obtain
'adjustment of status' rather than an immigrant visa to become a lawful
permanent resident." *Scialabba*, 573 U.S. at 46 n.1; *see also Choe v.
INS*, 11 F.3d 925, 928 (9th Cir. 1993).   "[T]he criteria for securing
adjustment of status and obtaining an immigrant visa are materially
identical," and the Supreme Court uses "the single term 'immigrant visa'
to refer to both." *Scialabba*, 573 U.S. at 46 n.1.

which visas are more limited, *see* 8 U.S.C. §§ 1151(a)(1), 1153(a)(1)-(4); *see also Scialabba*, 573 U.S. at 46–47.

If the alien seeking lawful-permanent-resident status is not in the category of "immediate relative," but falls into one of the five family-preference categories, a sponsoring U.S. citizen or lawful permanent resident must first file an I-130 petition on behalf of the applying alien. *See* 8 U.S.C. §§ 1154(a)(1)(A)(i), (a)(1)(B)(i)(I); 8 C.F.R. § 204.1(a)(1). USCIS reviews the I-130 visa petition, and, "[a]fter an investigation of the facts in each case . . . shall . . . approve the petition[,]" if it is determined "that the facts stated in the petition are true" and "that the alien in behalf of whom the petition is made . . . is eligible for preference under" § 1153. 8 U.S.C. § 1154(b); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1155 (9th Cir. 2013) ("The decision of whether to approve an I-130 visa petition is a nondiscretionary one . . . .").

Filing this form merely gives the applicant "a place in line" to wait for a visa number to be available in the applicant's family-preference category. *Scialabba*, 573 U.S. at 47. Because the number of visas that can be issued each year in each of the five family-preference categories is limited by statute based on the prospective immigrant's country of origin and category, *see* 8 U.S.C. §§ 1151(c), 1152(a)(2), 1153(a)(1)-(4), "and demand regularly exceeds supply," *Scialabba*, 573 U.S. at 48, the applicant is placed in a line with others in the same category in order of "priority date," meaning the date the relative filed the I-130 petition with USCIS, *see* 8 U.S.C. § 1153(e)(1), 8 C.F.R. § 204.1(b); *see also Tovar*, 882 F.3d at 897. Each month, the Department of State estimates how many visas can be made available, *see Zixiang Li v. Kerry*, 710 F.3d 995, 997 (9th Cir. 2013), and "sets a cut-off date for each family

preference category," *Scialabba*, 573 U.S. at 48 (citing 8 C.F.R. § 245.1(g)(1); 22 C.F.R. § 42.51(b)). For example, in January 2020, the Department of State estimated that there would be visa numbers available for all the Chinese-born applicants in a particular family-preference category whose I-130 petitions were filed on or before July 15, 2008.[4] "The system is thus first-come, first-served within each preference category, with visas becoming available in order of priority date." *Id.* "After a sponsoring petition is approved but before a visa application can be filed, a family-sponsored immigrant may stand in line for years—or even decades— just waiting for an immigrant visa to become available." *Id.* at 50.

Only after a visa number becomes available for an eligible family-preference applicant may the applicant file an application for adjustment of status (Form I-485, Application to Register Permanent Residence or Adjust Status), pursuant to 8 U.S.C. § 1255. *See Zixiang Li*, 710 F.3d at 997; *see also* 8 C.F.R. § 245.2. This I-485 application "requires an alien to demonstrate in various ways her admissibility to the United States." *Scialabba*, 573 U.S. at 48–49; *see also* 8 U.S.C. § 1182, 8 C.F.R. § 245.1(b), (c) (listing statutory bars to admissibility). The process includes a medical examination, 8 C.F.R. § 245.5, and an interview, 8 C.F.R. § 245.6. Estimated processing times for family-based I-485 applications at various USCIS California field

---

[4] *See* State Department Visa Bulletin for January 2020, 37 Dept. of State Publication 9514, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2020/visa-bulletin-for-january-2020.html.

offices range from 13 to 23.5 months. *USCIS, Check Case Processing Times*, https://egov.uscis.gov/processing-times/.[5]

A pending application for adjustment of status "does not confer lawful immigration status on an applicant," 7 USCIS-PM B.3(E), and an alien therefore "may be subject to removal proceedings unless and until the . . . adjustment application . . . is approved," *id.*; *see also United States v. Latu*, 479 F.3d 1153, 1155 (9th Cir. 2007) (holding that a "pending I-485 application for adjustment of status d[oes] not affect . . . removability").

Unlike the "nondiscretionary" decision whether to grant an I-130 visa petition, *Ching*, 725 F.3d at 1155, the USCIS's "decision to grant an adjustment of status is purely discretionary," *Kim*, 810 F.2d at 1497. Therefore, even if the alien has satisfied the statutory requirements for adjustment of status, the Attorney General or USCIS may ultimately deny the alien's I-485 application after review. *See* 8 U.S.C. § 1255(a); *see also Agyeman v. INS*, 296 F.3d 871, 879 (9th Cir. 2002); *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1102 (9th Cir. 2011).

B

The foregoing framework sheds light on the time frame for Ayanian's efforts to adjust his status to that of lawful permanent resident. Ayanian's mother and sister, both of whom are American citizens, submitted I-130 petitions on his behalf on June 22, 2007. USCIS subsequently approved these petitions. At the time of oral argument, the Department

---

[5] Aliens may request that USCIS expedite the adjudication of their applications, which are granted in limited circumstances. 1 USCIS-PM A.5. Ayanian has not indicated that he has made such a request.

of State had not yet made a visa number available for Ayanian, because his priority date of June 22, 2007 was not yet current.

As of November 2022, a visa is available to family-preference applicants with a priority date of December 15, 2007 or earlier.[6]  This allows Ayanian to submit an I-485 application for adjustment of status.  USCIS must then process the application, a process estimated to take between 13 and 23.5 months, to determine whether Ayanian has met the various statutory and regulatory requirements for adjustment of status and whether the application should be granted as a matter of discretion.  Accordingly, while it is not known exactly when (or whether) Ayanian will be granted lawful permanent resident status, the process will likely last for at least another year, and potentially much longer.

Accordingly, Ayanian is not requesting a mere brief stay of proceedings to give the government time to implement a decision it has already made.  Rather, Ayanian must wait an indeterminate amount of time before his adjustment-of-status application is resolved, and there is no guarantee that it will be resolved in his favor.

C

Having determined the merits of Ayanian's petition for review and the present state of affairs of his efforts to adjust his status, we now consider the request to refer this case to the Ninth Circuit's mediation program.

---

[6] *See* State Department Visa Bulletin for November 2022, 71 Dept. of State Publication 9514, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2023/visa-bulletin-for-november-2022.html.

We begin by considering whether Ayanian's petition for review of the BIA's denial of his motion to reopen is the type of dispute appropriate for mediation. The purpose of the Ninth Circuit's mediation program is "to facilitate the voluntary resolution of appeals in order to reduce the court's workload and to offer parties an alternative to litigation to resolve their disputes." Ninth Circuit General Order 7.1. "Mediation, as that term is commonly understood, is a method of nonbinding dispute resolution involving a neutral third party who tries to help the disputing parties reach a mutually agreeable solution" of their dispute. *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1240 (11th Cir. 2008) (citations and quotation marks omitted). The mediator will "facilitate negotiations among the parties to help them reach a mutually acceptable resolution," Ninth Circuit, *The Mediation Process*,[7] and "in all cases . . . help[] the parties to define the issues, to overcome barriers to communication, and to explore alternative methods of resolving their dispute," Jay E. Grenig, 1 Alt. Disp. Resol. § 4.1 (4th ed. 2016). Mediation is particularly appropriate in: (1) cases "in which the parties have a continuing relationship that they wish to preserve"; (2) "[c]ases in which the dispute is caused by poor communication between the parties"; or (3) "[c]omplex cases requiring creative solutions." Grenig, 1 Alt. Disp. Resol. § 4.1.

Ayanian's petition for review is not the sort of dispute that is appropriate for mediation.[8] Ayanian concedes that

---

[7] https://www.ca9.uscourts.gov/mediation/the-mediation-process.

[8] The dissent suggests that mediation might be useful for "bringing parties to the table," and quotes government counsel's statement that

the dispute involving his claim that the BIA erred in resolving his second motion to reopen lacks merit. Accordingly, Ayanian is not seeking (and does not need) a creative solution to his claims, nor does he require a mediator to assist in preserving the parties' relationship or to overcome poor communications.  The parties have not indicated that transferring this matter to mediation will advance Ayanian's adjustment-of status process.  Nor have the parties suggested how a mediator's assistance in negotiating, defining the relevant issues, or exploring alternatives would assist Ayanian in achieving his goal.

Rather, it appears the parties view mediation as a device for putting Ayanian's dispute into a holding pattern.  Indeed, the parties have not disguised the fact that the objective of transferring this matter to mediation is to delay Ayanian's removal from the country until the government has agreed to provide discretionary relief, whether in the form of a stay of removal or the approval of his application for lawful permanent residency.  Such use of mediation would not serve "the strong judicial policy that favors settlements of disputes," *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 939 (9th Cir. 2007) (cleaned up), but would instead involve staying the case for an indeterminate period of time, thus letting it linger on our docket, "asleep but not dead," *Sarkar*, 39 F.4th at 618.  It is an abuse of our mediation process to use it for a purpose unrelated to resolving disputes and as a

---

mediation might give her "a little bit more push" with DHS.  Dissent 27. But neither the dissent nor government counsel explain why mediation would compel the government to offer Ayanian speedier relief when the scheduled oral argument before the Ninth Circuit—after full briefing on Ayanian's petition for review—did not.

substitute for the issuance of a stay.  Therefore, the request
to stay this case by transferring it to mediation is denied.[9]

## D

Although we decline to use judicial procedures such as
mediation to displace the government's authority over
enforcement actions in immigration proceedings, Ayanian is
not without other avenues for relief.  The "Government has
numerous means to avoid enforcement against [Ayanian] if
that is what it wants," *Sarkar*, 39 F.4th at 621, including
many "specific procedural tools" to hold Ayanian's case in
abeyance, if it is inclined to do so, *id.* at 620.  These tools
include remanding the matter to the BIA, moving to reopen
proceedings with the BIA or to dismiss the proceedings,
requesting a continuance from the BIA, or simply deciding
not to execute Ayanian's final order of removal.  *See id* at
620.  Because "the government is always in control of an
alien's removal," *id.* at 619, the government may exercise its
"enforcement prerogative" as it sees fit, *id.* at 621.[10]

---

[9] The dissent's remark that Ayanian's "plea [for mercy] may have been
more warmly received by other panels of our court," Dissent 29 n.6,
reflects the reality that judges may be moved by sympathy to tinker with
law and procedure to achieve a charitable result.  But doing so diminishes
the crucial role we play in our federal system, which is to apply the laws
"implementing Congress's policy judgments, with fidelity to those
judgments," *Bank Markazi v. Peterson*, 578 U.S. 212, 232 (2016), and
refrain from enforcing our own sense of equity.

[10] On appeal, Ayanian seeks "the remedy of prosecutorial discretion."
We lack jurisdiction to review this contention under 8 U.S.C. § 1252(g),
which "bar[s] review of discretionary, quasi-prosecutorial decisions"
made during removal proceedings.  *Vilchiz-Soto v. Holder*, 688 F.3d 642,

But such enforcement decisions are the prerogative of the Executive Branch, not the judiciary. An "agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion," *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), and this is "especially true in the immigration context, where the Supreme Court has recognized that 'the Attorney General's discrete acts of commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders' are exercises in prosecutorial discretion," *Sarkar*, 39 F.4th at 619 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (alterations in original)). Indeed, the Supreme Court has long recognized "the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018). We are "acutely aware of the crisis in the enforcement of our immigration laws," and we have observed that "[t]he burden of dealing with these issues has fallen disproportionately on the courts of our circuit." *East Bay Sanctuary Covenant*, 932 F.3d at 774. But "as much as we might be tempted to revise the law as we think wise, revision of the laws is left with the branch that enacted the laws in the first place—Congress." *Id*. at 774–75. The judiciary does not have authority to "displace congressional choices of policy," *Landon v. Plasencia*, 459 U.S. 21, 35 (1982), nor to circumvent the Executive's role by effectively staying Ayanian's removal, as "[t]he exclusion of aliens . . .

644 (9th Cir. 2012) (citing *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1120–21 (9th Cir. 2001)).

is inherent in the executive power to control the foreign affairs of the nation," *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).  In this case, we have fulfilled our judicial role by upholding the BIA's denial of Ayanian's second motion to reopen after review.  The Executive Branch now has full and exclusive authority to determine whether to allow Ayanian to stay in this country pending resolution of his application for adjustment of status.

**PETITION DENIED.**

---

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's reasoning and conclusion on the merits of Ayanian's second motion to reopen.  Ayanian's second motion is time- and number-barred, and he offers no evidence of changed country conditions to escape the bar. Indeed, he offers us no evidence new or different from that supporting his first motion to reopen.  However, I respectfully dissent from the majority's denial of the parties' joint request to refer this case to mediation.

As to the narrow issue before us, the majority is correct to conclude that the BIA did not abuse its discretion in denying Ayanian's second motion to reopen.  But Ayanian is properly before our court on his petition for review, and though he may lack a meritorious asylum claim—as his counsel unfortunately appears to concede—Ayanian has other forms of immigration relief available.

In view of this pending relief, at oral argument, the parties submitted a joint request to refer this petition to the

Ninth Circuit Mediation Unit.  We should have granted this motion.  Mediation is an effective tool to fully, fairly, and efficiently resolve certain immigration cases presented to our court.  We should not be reticent in a proper case to use it—especially when the government itself joins in such a request.

## I.

It is well known that our nation's immigration system is broken.  It is calcified by decades of Congressional inaction, destabilized by dramatic shifts in enforcement policies, and currently burdened by COVID-19-induced processing backlogs.  Congress's repeated failures to update our immigration laws leave noncitizens, advocates, and Executive Branch officials in an untenable position, forced to work around systematic pitfalls in this fractured system.

Ayanian's proceedings are a case in point.  Congress—not the Executive Branch—caps the number of immigrant visas that can be issued each year.  8 U.S.C. § 1153.  The State Department issues such visas and forecasts future priority dates.  Once USCIS determines that a visa is available, the agency processes adjustment of status applications for noncitizens seeking lawful permanent resident status in our country.  *See generally* Maj. Op. 15–18.  Ayanian's U.S. citizen family members submitted visa petitions on his behalf more than 15 years ago, in June 2007.[1]

---

[1] While Ayanian's priority date does not appear to be stated in the record, government counsel indicated that the petitioner's priority date is in June 2007.  *See* Oral Argument at 3:59–4:02, *Ayanian v. Garland* (No. 16-70809), https://www.ca9.uscourts.gov/media/video/?20220919/ 16-70809/ (DOJ Counsel:  "I think [Ayanian] has a June '07 priority date.");  *id.* at 8:23–8:30 (DOJ Counsel:  "[Ayanian's] priority date is

Since that time, Ayanian has dutifully waited in line and neither engaged in nor been convicted of any conduct that would render him inadmissible.

At this juncture, there is nothing the parties can do to expedite issuance of a green card or guarantee that Ayanian will ultimately be granted lawful permanent resident status. Even though Ayanian is finally within striking distance of a green card, his case, like those of the millions of noncitizens backlogged in our immigration courts or seeking relief before USCIS, is snarled in bureaucratic proceedings through no fault of his own. Ayanian is waiting for our immigration system to catch up with him.

## II.

At oral argument, the parties jointly requested referral to the Ninth Circuit Mediation Unit. This unit is staffed by diligent, creative professionals who can help Ayanian and the government amicably resolve this dispute without expending additional judicial time and resources. The panel majority denies the parties' joint request for this limited procedural remedy, reasoning that it is an "abuse of our mediation process to use it for a purpose unrelated to resolving disputes and as a substitute for the issuance of a stay." Maj. Op. 21–22.

This case did not present a master class in lawyering.[2] Like the majority, I disagree with petitioner's counsel's

---

June 22 of '07. So as soon as [the State Department] gets to June, he will qualify to adjust.").

[2] I share the majority's incredulity at petitioner's counsel's concession at oral argument that she lacked an argument on the merits. Maj. Op. 11 & n.2. I am equally perplexed by the inability of the Departments of Justice and Homeland Security to confer prior to argument before our panel. In

inartful description of the purpose of mediation which is not, of course, to "let [a] case trail until in fact [a petitioner] can get a green card[.]"**³** The majority cites treatises and website descriptions which accurately set forth the purposes of mediation and alternative dispute resolution. Maj. Op. 20. The Ninth Circuit Mediation Unit clearly adheres to those tenets, as evidenced by its remarkable track record of efficiently resolving both cases referred by panels of our court, and immigration cases in particular.**⁴**

But the majority's retreat into rigid formalism ignores mediation's most basic function: bringing parties to the table. *See generally* 1 Alan Alhadeff, Alt. Disp. Resol. Practice Guide § 23:6 (2021) (describing format of mediation sessions, including joint opening session, "shuttle diplomacy moving from private caucus to private caucus," and "subsequent joint sessions with all counsel present"). As government counsel noted at oral argument, referral to mediation would give her—a Department of Justice attorney—"a little bit more push" with her client, the

---

view of the parties' amenability to resolving this case before argument, the government's failure to agree on a proposed course of action, such as an exercise of prosecutorial discretion, results in an unfortunate waste of judicial resources.

³ Counsel for Ayanian: " . . . I would fall on the mercy of the court and let this case trail until he can get a green card, rather than litigate the merits of the case." Oral Argument at 10:04–10:14, *Ayanian v. Garland* (No. 16-70809), https://www.ca9.uscourts.gov/media/video/?20220919/16-70809/

⁴ In 2022, the mediation unit received 67 panel referrals and resolved 49 such referrals—a resolution rate of more than 73%. In January 2022, the mediation unit had 253 pending immigration cases. By November 2022, that number dropped significantly, to 68—coincidentally, also a more than 73% reduction.

Department of Homeland Security (DHS).**[5]**  Only DHS may determine whether Ayanian remains an enforcement priority and whether the agency should continue pursuing his removal.  A referral to mediation—and a regular cadence of mediation conferences—will prompt DHS to review Ayanian's case and determine whether the parties can agree to any immediate relief.  Regardless of how counsel view the purposes of mediation, our able mediators are more than capable of ensuring that the parties operate in good faith.

It is doubtlessly true that the Executive Branch has many tools to resolve this dispute without our intervention.  Maj. Op. 22.  (noting that the government could move to remand, reopen, dismiss, or continue removal proceedings, or decline to execute Ayanian's removal order).  At this stage of appellate review, the judiciary's tools are comparatively limited and blunt.  In view of this disparity, the panel majority's decision to send this case back to the agencies and keep its hands clean is understandable.  *Id.*  ("Although we decline to use judicial procedures such as mediation to displace the government's authority over enforcement actions in immigration proceedings, Ayanian is not without other avenues for relief.").

The Executive Branch may be better placed to tailor relief to the particulars of Ayanian's case.  But the parties do not ask us for extraordinary relief.  They jointly request a modest procedural remedy unquestionably within the

---

[5] DOJ Counsel: "[I]f the court is amenable to [granting the parties' joint request for referral to mediation], that gives me a little bit more push with DHS, it really does.  It allows me to basically to get them to kind of like move their feet a little faster[.]"  Oral Argument at 7:11–7:20, *Ayanian v. Garland* (No. 16-70809), https://www.ca9.uscourts.gov/media/video/?20220919/16-70809/.

judicial ken.  We readily could have issued a one-line order granting the joint request for mediation.  Such an order would have saved us from preparing dueling majority and dissenting opinions, in view of the clear fact that Ayanian has relief available.  The majority's denial of the parties' joint request results in a highly inefficient use of government resources.

Finally, the majority balks at Ayanian's counsel's plea for our court's "mercy."[6]  Counsel's request may not sound in the formal register of an appellate brief.  But it calls to mind Justice Blackmun's precept that "compassion need not be exiled from the province of judging."  *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 213 (1989) (Blackmun, J., dissenting).

For the large majority of noncitizens petitioning for review of their cases, two or three judges of our court have the last word.  They decide whether a family remains intact, whether a noncitizen student completes her studies, or whether loved ones are exiled to a country they no longer call home.  Faced with the extraordinary sanction of removal, boxed in by a broken immigration system, counsel's request for any remedy available under law is not unreasonable.  Our court should remain open to using any judicially available procedural tools—including referrals to mediation, stays of appellate proceedings, or administrative closure—to see justice in each case.  I would grant the

---

[6] *See supra* note 2.  This plea may have been more warmly received by other panels of our court.  But even so, I would recommend that future litigants make legal arguments instead of pleas for mercy before the federal courts.

parties' joint request for referral to our mediation unit and let the mediators do their job.